UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRITT INTERACTIVE, LLC | ) | |
| an Indiana Limited Liability Company, and | ) | |
| TOWNEPOST NETWORK, INC., | ) | |
| An Indiana Corporation | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:16−cv−02884−TWP−MJD |
| v. | ) | |
| | ) | |
| A3 MEDIA, LLC, | ) | |
| an Indiana Limited Liability Company, | ) | |
| COLLECTIVE PUBLISHING, LLC | ) | |
| An Indiana Limited Liability Company | ) | |
| YELENA LUCAS, NEIL LUCAS, | ) | |
| JANELLE MORRISON, CHILLY PANDA | ) | |
| LLC, an Indiana Limited Liability Company, | ) | |
| DANN VELDKAMP, and JODY VELDKAMP | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs Britt Interactive, LLC ("Britt Interactive") and TownePost Network, Inc. ("TownePost") by counsel, for their Second Amended Complaint against Defendants A3 Media, LLC ("A3 Media"), Collective Publishing, LLC ("Collective Publishing"), Yelena Lucas ("Ms. Lucas"), individually, Neil Lucas ("Mr. Lucas"), individually, Janelle Morrison ("Ms. Morrison"), individually, Chilly Panda Media, LLC ("Chilly Panda"), Dann Veldkamp ("Dann"), individually, and Jody Veldkamp ("Jody") individually, allege and state the following:

## PARTIES

1.     Britt Interactive, LLC is an Indiana limited liability company with its principal place of business in Fishers, Indiana.

2.      TownePost Network, Inc. is an Indiana corporation with its principal place of business in Fishers, Indiana.

3.      A3 Media, LLC is an Indiana limited liability company with its principal place of business in Fishers, Indiana.

4.      Collective Publishing, LLC is an Indiana limited liability company with its principal place of business in Fishers, Indiana.

5.      Yelena Lucas is an individual residing in Fishers, Indiana.

6.      Neil Lucas is an individual residing in Fishers, Indiana.

7.      Janelle Morrison is an individual residing in Zionsville, Indiana.

8.      Chilly Panda, LLC is an Indiana limited liability company with its principal place of business in Greenwood, Indiana.

9.      Dann Veldkamp is an individual residing in Greenwood, Indiana.

10.     Jody Veldkamp is an individual residing in Greenwood, Indiana.

## JURISDICTION

11.     This Court has subject matter jurisdiction over this case on the basis that a federal question exists in relation to Plaintiffs' Lanham Act trademark claims.

12.     This Court has personal jurisdiction over the parties as the parties regularly conduct business in the State of Indiana.

13.     Venue is proper in this Court because the parties' business activities which are material to this litigation are conducted in substantial part in Hamilton County, Indiana, Boone County, Indiana, and Johnson County, Indiana, all of which are located in the Southern District of Indiana.

## STATEMENT OF FACTS

14.     Tom Britt ("Mr. Britt") founded Britt Interactive in 2003.

15.     Britt Interactive began publishing a monthly newsletter and magazine, Geist Community Newsletter, and website, atGeist.com.

16.     Shortly thereafter, Britt Interactive started selling licenses for third-parties to use Britt Interactive's methods, techniques, intellectual property, and system to produce monthly hyper-local publications in designated territories and created a network of regional magazines for the communities surrounding Indianapolis.

17.     On or about December 21, 2012, Britt Interactive entered into a License Agreement with A3 Media for the geographical area of Zionsville, Indiana.  The Zionsville License Agreement is attached to Plaintiff's Appendix of Evidentiary Materials in Support of Second Amended Complaint ("Evidentiary Appendix") as Exhibit A.

18.     On or about October 17, 2013, Britt Interactive entered into a second License Agreement with A3 Media for the geographical area of Carmel, Indiana (collectively "the License Agreements"). The Carmel License Agreement is attached to the Evidentiary Appendix as Exhibit B.

19.     A3 Media and Collective Publishing are operated by Mr. Lucas[1] and his wife, Ms. Lucas.

20.     In September 2013, Janelle Morrison ("Ms. Morrison") began writing for Carmel Magazine, Zionsville Magazine, and other publications in the TownePost Network.  She wrote primarily for A3 Media in their two licensed publications and has had administrative access to TownePost's social media accounts.

---

[1] According to the Indiana Supreme Court Roll of Attorneys, Neil Lucas's law license is currently suspended.

21.     Under the License Agreements, Britt Interactive retained ownership of Carmel Community Newsletter referred to as "atCarmel.com" in the License Agreement and Zionsville Community Newsletter referred to as "atZionsville.com" in the License Agreement (collectively, the "magazines").

22.     A3 Media was granted a license to use Britt Interactive's methods, techniques, intellectual property, and systems, including the magazines.

23.     Prior to Britt Interactive licensing the magazine in Carmel to A3 Media and the Lucas', it was previously licensed to two other licensees.  A3 Media and the Lucas' were the first to license the magazine in Zionville.

24.     Although A3 Media was granted a license to use the magazines, A3 Media was not permitted to modify or change the magazine design in any manner unless it received Britt Interactive's prior written approval to do so pursuant to Section 3 of the Carmel License Agreement and Section 4 of the Zionsville License Agreement.

25.     In addition, Britt Interactive also owned the atCarmel.com domain, atZionsville.com domain, Carmel Community Newsletter naming rights, Zionsville Community Newsletter naming rights, business processes, customer data, intellectual property and weblog programming, design, and source code.

26.     Section 4.1 of the Carmel License Agreement and Section 5.1 of the Zionsville License Agreement states: Britt Interactive's responsibilities will include but not be limited to:

    a.  Print newsletter production and oversight management;

    b.  Ad design, both print and online, and associated processes oversight;

    c.  Weblog support, and updates;

    d.  Online advertising design and management;

e.  New product development and implementation;

f.  Accounting functions: invoicing, accounts payable, accounts receivable, income statements, bank deposits, etc.;

g.  CRM software support;

h.  On-going training and consultation monthly to insure financial success;

i.  Print vendor negotiations and pricing.

27.  Section 4.2 of the Carmel License Agreement and Section 5.2 of the Zionsville License Agreement provides that the Licensee's responsibilities will include but not be limited to:

j.  Sales (print, online, video, and other products and services);

k.  Editorial oversight, development, and costs;

l.  Printing, production, and mailing costs associated with the newsletter;

m.  All office supplies, utilities, mileage, and other business related costs.

28.  At all times Britt Interactive retained ownership of the magazines until, in 2014, Mr. Britt established TownePost Network which acquired all of the intellectual property and License Agreements from Britt Interactive.

29.  Britt Interactive and TownePost Network communicated the change of ownership to the Licensees at a general meeting that included all of the Licensees and designers. The Licensees were informed that the billing information would be changing to TownePost Network for both the customers and the Licensees as of February 1, 2014. A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit C.

30.  In addition, all publications began to include the TownePost Network Inc. name and logo on the front of the publication and the mark TownePost Network was registered with the

U.S. Patent and Trademark Office on February 16, 2016.  A true and accurate copy of the Certificate of Registration is attached to the Evidentiary Appendix as Exhibit D.

31.    Since January 2015, the Licensees, including A3 Media, have been paying management fees, page layout fees, credit card fees, shared printing costs, and all other required fees or costs to TownePost.  These fees cover TownePost's expense for providing various administrative, design, printing, web and business process functions for its Licensees, including access to the cloud-based system used to manage magazine sales, production and design.

32.    For the past three (3) years, Britt Interactive and TownePost have used MagazineManager.com.  In June, 2016, TownePost migrated to MagHub.com ("MagHub") and were fully integrated on July 1, 2016.

33.    All the customer data, invoices, accounts receivable, and contracts were imported into MagHub and each Licensee has a user seat to access the system that is paid for by TownePost.

34.    Orders are created online and then emailed directly to the clients for approval.  Approval is typically received through an email confirmation or digital signature.

35.    Once an order is approved by the client, it is invoiced on or around the fifteenth (15th) of each month prior to the issue date.  For example, the October 2016 issues were invoiced on September 15, 2016.

36.    All invoices are issued by TownePost for all ads and services sold in all publications, including A3 Media.  Customers receive one invoice for the applicable billing period, regardless of whether they advertised in more than one publication.

37.    All invoices are emailed electronically to the billing contact from Jeanne Britt ("Ms. Britt"), the Finance Manager.  Ms. Britt is the only one who has the authority and capability of invoicing TownePost customers through Maghub.

38.     Customers pay their invoices to "TownePost Network Inc." and may click through to a secure site to pay their invoices with a credit card from this email.

39.     All account receivables collected on behalf of the Licensees are distributed to them each week with detail of their weekly transfer.

40.     At the end of the month's cycle, after the publications are sent to the printer, TownePost sends a monthly bill to the Licensees for their shared printing costs, commissions payable to sales people, credit card fees, writer payments, production fees, and management fees. These fees are paid directly to TownePost.

41.     In some cases, Licensees request a copy of the accounting records kept by TownePost Network in a software program called QuickBooks.  This file is made available weekly with their weekly reporting and contains invoice data, receivables and payables, and all other customer data for each licensee.

A.  *Name Change*

42.     In February 2014, publications began using a new masthead logo designed by a contractor paid by TownePost. This logo incorporated the TownePost Network name above it reading "A TownePost Network Publication".

43.     On or about July 21, 2015, TownePost informed the Licensees via their online portal that the names and logos of the publications would be changing from "newsletters" to "magazines".  Licensees were given the choice to use "Community Magazine" or just "Magazine" in each territory.  In the online portal, Ms. Lucas posted the following: *Hip Hip Hooray! We decided we wanted to fill in the blank with Mother F****ing Magazine!  Does that work?  If Mother F****ing is not available then we choose to simply be Carmel Magazine and Zionsville*

7

*Magazine.*  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit E.

44.     The August 2015 publications were the first to use the new name and logo.

45.     The new design was modified by a TownePost employee and TownePost paid for and retains the ownership rights in the name and logo.

46.     Despite TownePost's prior use of the names and ownership of the marks, A3 Media applied for state trademarks for the names "Zionsville Magazine" and "Carmel Magazine" on August 8, 2016.  Along with their applications, A3 Media submitted specimens to show that the mark was being used in commerce.  The specimens submitted by A3 Media were copies of the magazines which specifically stated that it was "A TownePost Network Publication."  True and accurate copies of the trademark applications are attached to the Evidentiary Appendix as Exhibits F and G respectively.

B.  *Conversion to Franchise Model*

47.     On or about May 2016, TownePost Network began offering franchises for sale as opposed to licenses.

48.     TownePost informed its Licensees that it was converting to the franchise model on or about July 11, 2016, and that the Licensees would have the option to become franchisees pursuant to the clause in their License Agreements.  The clause in A3 Media's License Agreements state: "In the event that Britt chooses to transform the licensees to franchisees, Licensee will be given the opportunity to purchase the territory franchise for $1.00."  If a Licensee did not want to become a TownePost Network franchisee, then TownePost would buy out the Licensee pursuant to the License Agreement.

49.     In the event Licensees opted for the buy-out, nothing in the License Agreements prevented them from working in the publishing industry or owning their own publishing business. The License Agreements do, however, prevent the unauthorized use of Britt Interactive's property upon termination including but not limited to the atCarmel.com domain, the atZionsville.com domain, Carmel Community Newsletter, Zionsville Community Newsletter, Carmel Magazine, Zionsville Magazine, Carmel Community Magazine, Zionsville Community Magazine, business processes, customer data, intellectual property and weblog programming, design, and source code, and all other intellectual property.

50.     Neither Mr. Lucas nor Ms. Lucas informed Mr. Britt of whether A3 Media was going to become a franchisee or select the buy-out option.

51.     TownePost and Mr. Britt only became aware of A3 Media's apparent decision to abandon the license after being contacted by customers on September 15, 2016 asking about the situation after they were contacted by Mr. and Ms. Lucas.

52.     Upon learning this information, Mr. Britt ran reports through Magazine Manager, the previous system, and MagHub, the current system, for Ms. Lucas's activity within the system. In July 2016, Ms. Lucas made approximately ten (10) calls, logged sixty-seven (67) emails, had eight (8) appointments, and completed twenty-seven (27) tasks.  In August 2016, Ms. Lucas made approximately three (3) calls, logged thirty-five (35) emails, had six (6) appointments, and completed twenty-four (24) tasks.  In September, Ms. Lucas has made zero (0) calls, logged one (1) email, and has had zero (0) appointments.  This activity is a stark contrast to Ms. Lucas activity for the three months immediately preceding the announcement that TownePost would be converting to a franchise, when she made a total of 511 calls, had four (4) meetings, and logged

1542 emails.  This averages to about 170 calls a month, one (1) meeting a month, and 514 emails

a month.  A summary of Ms. Lucas' activity is attached to the Evidentiary Appendix as Exhibit H.

    C.   *Issues with A3 Media and Collective Publishing*

      53.    In July 2016, Ms. Morrison began performing social media services for Carmel

Magazine, Zionsville Magazine, Geist Magazine, Fishers Magazine, and Broad Ripple Magazine.

Ms. Morrison was given "Administrator" access to all of TownePost's Facebook pages and twitter

accounts through Hootsuite.com.

      54.    On or around July 17, 2016, Ms. Morrison changed Mr. Britt's access to the Carmel

and Zionsville Magazine pages on Facebook from "Administrator" to "Editor" and Mr. and Ms.

Lucas were granted "Administrator" access.  The change in Mr. Britt's status prohibited him from

being able to manage the users on the page.  On or about July 27, 2016, Mr. Britt requested that

he be reinstated as an Administrator on the Carmel Magazine Facebook page so that he could boost

a post that was paid for by Wickliff Auction Company.  Despite his request, Mr. Britt was never

reinstated as an administrator on the Facebook page.   A true and accurate copy of this

communication is attached to the Evidentiary Appendix as Exhibit W.

      55.    On or about August 17, 2016, Ms. Lucas began circulating a document to

advertisers that purported to cancel their contracts with the Carmel Magazine and Zionsville

Magazine for the remaining months of October 2016, November 2016 and December 2016 and

render such contracts null and void.  The contracts referred to in this document are the contracts

between the advertisers and TownePost.  In conjunction with the cancelation document, Ms. Lucas

provided advertisers with advertising agreements for Defendants' version of the Carmel Magazine

and Zionsville Magazine.  A true and accurate copy of the cancelation document and advertising

agreement are attached to the Evidentiary Appendix as Exhibits NN and OO respectively.

56.     In the cancellation document, Ms. Lucas acknowledges and accepts the cancellation of the remaining months of the contract with TownePost.  However, Ms. Lucas had no authority to do so and is intentionally interfering with TownePost's contracts.

57.     For example, Joe Kempler ("Mr. Kempler") of Remax Ability Plus contracted with TownePost to run an advertisement in all of the 2016 issues of the <u>Carmel Magazine</u>.  Each advertisement cost $1,300.00 and Mr. Kempler was invoiced monthly for payment.  A true and accurate copy of the agreement is attached to the Evidentiary Appendix as Exhibit PP.

58.     In comparing the advertisement agreement between TownePost and Mr. Kempler to the agreement Ms. Lucas provided, the size of the advertisement, the frequency, the advertisement notes, and the cost are identical.  See Exhibits OO and PP.

59.     On or about August 24, 2016, Ms. Lucas began soliciting quotes from printers for printing a monthly magazine matching the size, paper and quantities of the Carmel Magazine and Zionsville Magazine.  Ms. Lucas submitted one such quote to PERQ, LLC ("PERQ").  The project for which she asked for a quote, Carmel Automobilia, was a past insert that had already been printed on July 27, 2016.  In her response to the quoted price from PERQ, Ms. Lucas sent an email to Sandy McNichols asking if they could match their current printing price of $5,500.00.  The subject line of the email is "Quote #18681-1 for Towne Post Media Network."  In addition, in Ms. Lucas' signature line, she is listed as VP of sales for TownePost Media Network, <u>Carmel Magazine</u> and <u>Zionsville Magazine</u>.  This gives the impression that Ms. Lucas is soliciting printing quotes on behalf of TownePost and trying to negotiate better pricing due to the volume of printing which she was not authorized to do.  A true and accurate copy of this communication is attached to the Evidentiary Appendix as Exhibit I.

60.     On or about September 1, 2016, A3 Media sent an Invoice to Vine & Table Gourmet Market ("Vine & Table").  The invoice states: "Make all checks payable to A3 Media." A true and accurate copy of the Invoice is attached to the Evidentiary Appendix as Exhibit J.

61.     The original proposal for insertions into the Carmel and Zionsville magazines submitted to Vine & Table on January 7, 2016 contained TownePost's marks and indicated that $12,000.00 worth of services would be provided by TownePost.  Despite this proposal, A3 Media sent Vine & Table a separate agreement which claimed, among other things, that A3 Media would provide the services, not TownePost, and provided for a $3,000.00 cancellation fee should Vine & Table cancel the agreement.  A true and accurate copy of the proposal and agreement is attached to the Evidentiary Appendix as Exhibits K and L respectively.

62.     Vine & Table paid the initial invoice for $3,000.00 to A3 Media and upon learning that they were no longer with TownePost, Vine & Table stopped payment on the check. Ms. Lucas then threatened the client in an email stating: "*It was a very unpleasant surprise to find that Vine & Table had stopped payment for no apparent reason on check #49298. I have tried to contact you to discuss this matter several times but have received no response.  I would like to know why you took such actions. Attached is a copy of the agreement between A3 Media and Vine & Table Gourmet Market. Please be advised as to whether Vine & Table has chosen to terminate the agreement. I direct your attention to the $3,000 termination fee payable to A3 Media in the last paragraph of the agreement.  Please give my husband Neil a call to discuss how to move forward.*" A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit M.

63.     On or about September 1, 2016, Ms. Lucas contacted Doug Marvel ("Mr. Marvel") with Marvelous Woodworking, LLC, an advertiser in the <u>Carmel Magazine</u> and <u>Zionsville</u>

Magazine, and asked him to sign an agreement that would cancel his current agreement with TownePost. When Mr. Marvel was invoiced by TownePost on September 15, 2016, he emailed Ms. Britt stating: *"I signed some paperwork a few weeks ago from Lena that cancelled my connection with TownePost. I shouldn't be billed any more by TownePost. Can you cancel or will you credit my account?"* A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit N.

64.     On or about September 15, 2016, after it became apparent that A3 Media had breached the License Agreements, Ms. Morrison's access to Geist Magazine, Fishers Magazine, and Broad Ripple Magazine's social media pages was suspended.  Ms. Morrison's access to Carmel Magazine and Zionsville Magazine's social media pages could not be suspended, however, since Ms. Morrison changed Mr. Britt's access to "Editor" of the pages.  The next day, Mr. Britt's access was removed entirely from the Carmel Magazine Facebook page.

65.     On or about September 16, 2016, a modified advertisement agreement was sent to Midtown Indianapolis for a one-and-a-half-page article in Carmel Magazine and Zionsville Magazine.  The agreement stated that checks should be made payable to the Publisher, Collective Publishing.  A true and accurate copy of the agreement is attached to the Evidentiary Appendix as Exhibit O.

66.     On or about September 19, 2016, Mr. Lucas sent an email to Toni Folzenlogel ("Ms. Folzenlogel"), a designer independently contracted by TownePost, and demanded that she turn over any design files allegedly owned by A3 Media.  Mr. Lucas further warned Ms. Folzenlogel that if she possessed any design files allegedly owned by A3 Media or used them without authorization, she would be equally liable under the Indiana conversion statute that he

attached to the email.  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit P.

67.     On or about September 20, 2016, A3 Media sent a letter to Ms. Britt terminating TownePost's services and demanded that TownePost transfer funds that A3 Media claims is owed to them and threatened to take legal action if TownePost did not comply by noon the next day.  A true and accurate copy of the letter is attached to the Evidentiary Appendix as Exhibit Q.

68.     The same day, Ms. Lucas sent an email to a database of 4,038 people stating that her email address had changed from lena@atcarmel.com to carmelmonthlymagazine@gmail.com. A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit R.

69.     On or about September 21, 2016, Chateau Kitchens called Mr. Britt asking about a credit card charge in the amount of TownePost's invoice for the September issue because the amount was charged to Collective Publishing.  Chateau Kitchens inquired whether TownePost was operating under the name Collective Publishing.  The invoice for Chateau Kitchens is attached to the Evidentiary Appendix as Exhibit S.

70.     Mr. Britt also received an inquiry from Beef & Boards about advertising in all of the TownePost Network magazines as it had been doing previously.  The email from Beef & Boards states:  *Beef & Boards had planned to have a ½ page ad in the October issue of TownePost. I understand that the package that included all of the various issues is no longer available. Is it too late to get in the other issues, and if not, what is available, and can we still work trade into it? Let me know as soon as you can, please, so we can make a decision here.*  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit T.

71.     When Mr. Britt called Beef & Boards, Beef & Boards explained that Ms. Lucas said that the option to advertise in all of the magazines was no longer available, but they were still able to advertise in <u>Carmel Magazine</u> and <u>Zionsville Magazine</u>.

72.     The communications between customers and the Defendants have caused confusion among customers as to which magazines they have agreed to advertise in and who they have agreed to pay.

73.     On September 22, 2016, A3 Media sent another letter to Ms. Britt and Mr. Britt demanding that TownePost transfer funds that A3 Media claims is owed to them and threatened to take legal action if TownePost did not comply by the end of the business day (5:00 p.m.).  A true and accurate copy of the letter is attached to the Evidentiary Appendix as Exhibit U.

74.     Despite A3 Media's claims, TownePost does not owe any money to it.  In fact, A3 Media owes TownePost approximately $2,652.68.  A true and accurate copy of the money owed by A3 Media is attached to the Evidentiary Appendix as Exhibit V.

75.     The same day, Ms. Lucas sent an email to Mr. Lucas's atcarmel.com email address, which Mr. Britt has access to as owner of the domain, stating: *OMG HONEY, PENCIL DICK TOM SUED A3 MEDIA!  I HOPE OUR LAWYERS ARE RIGHT THAT HIS LAWYER IS A DUMB ASS AND WE WILL OWN GEIST MAGAZINE WHEN THEY GET THROUGH WITH TOM AND JEANIE. OUR PLAN IS PERFECT.*  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit X.

76.     Upon information and belief, the "plan" referred to in Ms. Lucas's email relates to Defendants' intent to unlawfully interfere with the business relationship and contracts between TownePost and its customers and to unlawfully use TownePost's marks and trade on TownePost's goodwill and reputation.

77.     On or about September 24, 2016, Chris Plopper ("Mr. Plopper") of Village Mattress emailed Mr. Britt to inform him that there is no need for Mr. Britt or Robert Turk, a TownePost account manager, to contact him as he will no longer have anything to do with TownePost publications.  According to the email, Mr. Plopper made this decision after having a conversation with Mr. Lucas the day before.  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit Y.

78.     The next day, Mr. Marvel of Marvelous Woodworking emailed Mr. Britt and Ms. Lucas to suspend his advertising in the publications.  Specifically, Mr. Marvel stated: *Being a small company, the investment I have in advertising costs represents a major expenditure and the instability you have both demonstrated is enough of a concern that I am suspending any advertising until I have seen a quality product for a prolonged period of time. I would like to revisit advertising in your publication in Summer 2017. I hope this will be sufficient time to have worked out any issues you are obviously having.*  A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit Z.

79.     On or about September 27, 2016, A3 Media sent Mr. Britt letters demanding that he send A3 Media all advertisements for the October issues of the Carmel Magazine and Zionsville Magazine for placement in the October issues of the magazines by 5:00 p.m. that day.  A true and accurate copy of the letters are attached to the Evidentiary Appendix as Exhibits AA and BB respectively.

80.     The same day, a Twitter account for Defendants' Zionsville Magazine, @ZionsvilleMag, was created and the twitter account for Carmel Magazine which was originally @TownePostNetwork was changed to @CarmelMag.  The Twitter accounts, managed by Ms. Morrison, began posting images from the Zionsville Magazine and Carmel Magazine using

16

TownePost's common law marks.  In the description of the Twitter pages, it states that the Zionsville Magazine and Carmel Magazine are the ORIGINAL monthly magazines that feature fascinating stories about remarkable residents, businesses and charities in Zionsville and Carmel, Indiana respectively.  A true and accurate copy of the Twitter pages are attached to the Evidentiary Appendix as Exhibits CC and DD respectively.

81.     On or about September 30, 2016, Ms. Lucas sent an email to "advertisers of Carmel and Zionsville Magazines" stating that A3 Media had replaced TownePost as the vendor for providing billing, collections and production services.  In addition, the email recommends that advertisers contact their banks immediately to instruct them not to honor credit card transactions from TownePost and asks advertisers to mail checks to Collective Publishing.  Finally, the email asks advertisers to forward all emails they receive from TownePost to Ms. Lucas and to "not feel obligated to respond to TownePost inquiries" because, as Ms. Lucas states in the email, "We will handle them on our end."   A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit EE.

82.     In an October 1, 2016 tweet, @ZionsvilleMag tweeted the following: *FACEBOOK UPDATE: Please LIKE and follow the Zionsville Magazine-The Original! Thanks for your support! https://m.facebook.com/ZionsvilleMag/.*  A true and accurate copy of the tweet is attached to the Evidentiary Appendix as Exhibit FF.

83.     According to the Zionsville Magazine Facebook Page, "the Zionsville Magazine is the ORIGINAL Zionsville Magazine that has been published and mailed to residents of Zionsville, IN for the past 3 years."  This statement is inaccurate as A3 Media has not published and mailed the Zionsville Magazine to residents for the past three years.  A true and accurate copy of the Facebook page is attached to the Evidentiary Appendix as Exhibit GG.

84.     Upon information and belief, Plaintiffs believe that Ms. Morrison is working for A3 Media and Collective Publishing to monitor and post on the newly created social media accounts that are unlawfully using TownePost's common law marks.

85.     On or about October 4, 2016, Ms. Lucas sent 151 emails to advertisers regarding advertising in the November issues of the <u>Carmel Magazine</u> and <u>Zionsville Magazine</u>.   In the email, Ms. Lucas states: *You can see the latest issues of our Magazines by following the link below:*

### Carmel Magazine

*https://issuu.com/tombritt/docs/carmel_09-16*

### Zionsville Magazine

*https://issuu.com/tombritt/docs/zionsville_09-16*

Despite Ms. Lucas's contention, the Magazines are not owned by A3 Media and the September issues were not published by A3 Media as evidenced by the use of Mr. Britt's name in the links themselves, the TownePost marks on and in the Magazines, and the listing of TownePost as the Publisher in the Magazines.  Specifically, page 5 of the September issue of the <u>Carmel Magazine</u> states: *The Carmel Magazine is published by TownePost Network, Inc. and is written for and by local Carmel area residents.*  Similarly, page 5 of the September issue of the <u>Zionsville Magazine</u> states: *The Zionsville Magazine is published by TownePost Network, Inc. and is written for and by local Zionsville area residents.*   Stating otherwise is false, misleading and demonstrates Defendants' intent to trade on the goodwill and reputation established by TownePost to secure advertising contracts. A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit HH.  A true and accurate copy of page 5 of the September issues of the <u>Carmel Magazine</u> and <u>Zionsville Magazine</u> are attached to the Evidentiary Appendix as Exhibit RR and Exhibit SS respectively.

86.     On or about October 6, 2016, Kurt Spitler emailed Mr. Britt and Mr. Lucas to inform them that he would no longer be doing business with either of them until the issues are resolved. A true and accurate copy of the communication is attached to the Evidentiary Appendix as Exhibit II.

87.     On or about October 9, 2016, Ms. Morrison posted the following to her Facebook page:

*ZIONSVILLE RESIDENTS: You may have received a "Zionsville Magazine" and thought it had a different look and lacked the hyper-local content related to Zionsville that you normally see.  It is different because it was not produced by Neil Lucas and Lena Lucas, the ownership team that has been producing the Zionsville Magazine the past three years. The magazine you received was produced by a former vendor that provided layout and design services to the Lucases.*

*Not to worry! Be sure to keep an eye out for the REAL October issue of the Zionsville Magazine, featuring Ms. Elizabeth Coit, the executive director for Morning Dove Therapeutic Riding, Inc., on the cover.  The Zionsville Magazine with stories written by yours truly will be hitting mailboxes early this week.*

*Read other inspiring and informative stories about the people and events who help to make the Town of Zionsville a fantastic place to live, raise families, own businesses, and visit!*

*Neil and Lena Lucas and I, are dedicated to providing our readers with quality and meaningful content you have come to expect and our advertisers with measurable results and impeccable customer service.  We appreciate your support!*

A true and accurate copy of the post is attached to the Evidentiary Appendix as Exhibit JJ.

19

88.     In addition, the profile picture of the Zionsville Magazine Facebook page contained a mock-up of the cover of the October issue.  A true and accurate copy of the post is attached to the Evidentiary Appendix as Exhibit KK.

89.     Based on the Facebook posts, it became evident that Defendants were taking affirmative action to publish and distribute their versions of the Carmel Magazine and Zionsville Magazine in mid-October.   On October 11, 2016, Plaintiffs filed a Motion for Temporary Restraining Order with the Hamilton County Superior Court 3 ("Superior Court").   On October 12, 2016, Defendants' Counsel filed an Emergency Motion for Telephonic Hearing Before Elected Judge and a telephonic hearing was scheduled for October 17, 2016 at 1:30 p.m.

90.     On or about October 15, 2016, Defendants' October issues of its Carmel Magazine and Zionsville Magazine were distributed to residents in Carmel and Zionsville respectively.  TownePost's October issues of the Zionsville Magazine and Carmel Magazine were mailed on October 4, 2016.  In comparing Defendants' Carmel Magazine and Zionsville Magazine covers to TownePost's Carmel Magazine and Zionsville Magazine covers, the names, font, and color of the masthead are virtually identical.  The only difference is the removal of "A TownePost Network Publication" and the domains "atCarmel.com" and "atZionsville.com" from Defendants' magazine.  Additionally, many of the advertisements contained in Defendants' Carmel Magazine and Zionsville Magazine and TownePost's Carmel Magazine and Zionsville Magazine are identical.  A true and accurate copy of the covers of TownePost's October issue of the Carmel Magazine and Zionsville Magazine are attached to the Evidentiary Appendix as Exhibit LL and Exhibit MM respectively.  A true and accurate copy of the cover of Defendants' Carmel Magazine is attached to the Evidentiary Appendix as Exhibit TT.

91. In Defendants' version of the <u>Carmel Magazine</u>, a publisher's note was included which states:

> *When you look at the cover of this month's issue you may notice a bit of a cleaner design and the absence of any reference to TownePost Network. Beginning with this October issue of the Carmel Magazine and the Zionsville Magazine, we have replaced the TownePost Network as our vendor doing ad design, magazine layout and certain accounting functions. We have replaced them with a company called Collective Publishing. So expect to see the name associated more and more with our magazine in the future.*
>
> *You will continue to enjoy the same great local stories written by our same team of talented writers that are led by our head writer, Janelle Morrison. You will also continue to see the same dazzling photography of JJ Kaplan as well as other local photographers.*
>
> *We, Neil and Lena Lucas, have really enjoyed being the owners of the Carmel Magazine and Zionsville Magazine for over three years. We launched the Zionsville Community Newsletter in April 2013 and bought the Carmel Community Newsletter in October 2013, after it had experienced a rapid turnover of ownership. Under our ownership, we extended the newsletters with the Carmel Magazine and Zionsville Magazine. Under our ownership, circulation in Carmel has increased from roughly 10,000 homes to 25,000 homes.*
>
> *We want to assure you that we will continue to work tirelessly to raise the quality of the magazine as we have over the past three years. Our new design team has innovative ideas to refresh the look of the magazines that we are excited to implement in the future.*

> *We also look forward to continuing to provide the residents of Carmel and Zionsville with*
> *stories that connect you, our loyal readers for the past three years, to your neighbors and*
> *your community.  Please feel free contact Neil or Lena Lucas anytime.*

The publisher's note contains many falsehoods and misrepresentations not the least of which are erroneous claims that TownePost was merely the vendor for providing ad design, magazine layout, and certain accounting functions and that Collective Publishing was replacing TownePost as the new vendor.  A true and accurate copy of the Publisher's Note is attached to the Evidentiary Appendix as Exhibit QQ.

92.     On October 17, 2016, a telephonic conference was held with the Superior Court and Mr. Davis appeared as Counsel for Defendants A3 Media, Mr. Lucas, and Ms. Lucas and Josh Brown ("Mr. Brown") and Jon Mattingly ("Mr. Mattingly") appeared as Counsel for Plaintiffs. Plaintiffs' Motion for Temporary Restraining Order was discussed, among other items, and Defendants' Counsel requested that a hearing be held on the Motion before the Superior Court decided the issue and the Superior Court set a Hearing on the Motion for Temporary Restraining Order for October 17, 2016 at 3:30 p.m.

93.     Per the Superior Court's order, a Hearing on Plaintiffs' Motion for Temporary Restraining Order was held and Mr. Davis appeared on behalf of Defendants A3 Media, Mr. Lucas, Ms. Lucas, and Collective Publishing and Mr. Brown and Stephanie Maris ("Ms. Maris") appeared on behalf of Plaintiffs.  The evidentiary hearing was originally scheduled for twenty minutes but began at approximately 3:19 p.m. and concluded at approximately 4:47 p.m.  At the conclusion of the evidentiary hearing, the Superior Court granted Plaintiffs' temporary restraining order against Defendants A3 Media, Mr. Lucas, Ms. Lucas, and Collective Publishing and indicated that it was

immediately in effect and would be entered upon a revised Proposed Order being submitted from Plaintiffs' counsel to the Court and the posting of a $24,000.00 bond.

94.     On October 19, 2016, Plaintiffs submitted the proposed order and posted the $24,000.00 bond as directed by the Superior Court and an order granting the TRO against Defendants A3 Media, Mr. Lucas, Ms. Lucas, and Collective Publishing was issued.  The TRO was entered on October 19, 2016 at 3:55 PM and enjoined A3 Media, Mr. Lucas, Ms. Lucas and Collective Publishing from:

(a) distributing October issues, or any subsequent issues, of the "Zionsville Magazine" and/or the "Carmel Magazine";

(b) infringing TownePost's Licensed Marks in violation and contravention of the Lanham Act;

(c) infringing TownePost's common law marks in violation and contravention of the Indiana Trademark Act;

(d) using marks that are the same as or confusingly similar to TownePost's Licensed Marks or common law marks in any manner including but not limited to in a print magazine, newsletter, or online medium; and

(e) interfering with the contracts between TownePost and its advertisers.

The TRO issued by the Superior Court is set to expire at 3:55 p.m. on October 31, 2016 and a hearing on the continuance of the TRO was set for 3:00 p.m. on October 31st.  Defendants removed the case to federal court on or about October 21, 2016.

95.     Defendants are also sending advertisers November invoices for their versions of the Carmel Magazine and Zionsville Magazine with the assistance of Dann Veldkamp ("Dann"), Jody Veldkamp ("Jody") and Chilly Panda Media, LLC ("Chilly Panda").  Chilly Panda is currently

involved in litigation with Plaintiffs and Mr. Britt in the Johnson County Superior Court 1, Case No. 41D01-1608-PL-000072.  The subject matter of the litigation of the Chili Panda litigation in Johnson County is substantially similar to that of this case.  Preliminary injunction motions have been filed in Johnson County and both parties are awaiting a date from the Court setting the matter for a Hearing.

96.     Although the email was sent from Dann's email address, the email itself was signed by Mr. and Ms. Lucas.  Specifically, the email states:

> *Attached is your new invoice for your ads in the Carmel and Zionsville Magazines.*
>
> *The easiest way to pay your invoice is with our online Client Center.  Click here to make a payment:* http://chillypanda.apps.maghub.com/clients.
>
> *If you have any questions or concerns, please contact your account executive or our Accounts Receivables Department.*
>
> *We appreciate your business,*
>
> *Lena & Neil*

A true and accurate copy of the email is attached to the Evidentiary Appendix as Exhibit VV.

97.     Plaintiffs have a good faith belief that Defendants are using Dann, Jody and Chilly Panda as a way to circumvent the TRO.  Such actions demonstrate Defendants' indifference and disregard for the TRO and is evidence that Defendants, Dann, Jody and Chilly Panda are conspiring to harm Plaintiffs by unlawfully using Plaintiffs' common law marks and unfairly trading on the goodwill and reputation associated with the TownePost system.

98.     Additionally, upon information and belief, Jody assisted and or created a website with a URL consisting of www.carmelmonthlymagazine.com on October 21, 2016 at 9:54 (nearly four days after the TRO Hearing and two days after the TRO Order was issued) for A3 Media and

Mr. and Ms. Lucas to utilize in an effort to further confuse Towne Post customers and advertisers as to the source of the publications in Carmel and Zionsville, and in a deliberate effort to circumvent the TRO that was previously entered.

99.    On October 19, 2016, after the TRO was entered and two days after the TRO hearing at which the Court indicated that the TRO would be entered, Ms. Lucas sent an email to Cori Brown of Franklin Window World and offers Franklin Window World a discounted rate for advertising on the back covers of the Carmel Magazine and Zionsville Magazine for the November and December issues, noting that "the back covers are usually sold out for a year." Additionally, Mr. Davis has stated that Defendants plan on publishing a November and December issue of their Carmel Magazine and Zionsville Magazine, which would be a violation of the TRO.  A true and accurate copy of the October 19, 2016 email is attached to the Evidentiary Appendix as Exhibit UU.

100.    Furthermore, from the time in which the TRO was issued, Defendants have continued to use the names "Carmel Magazine" and "Zionsville Magazine" on their websites and link to previous issues of the magazines that were published by TownePost that contain TownePost's Registered Marks and other protected marks.  Specifically, Defendants' Twitter pages, @CarmelMag and @ZionsvilleMag, were still active on October 24, 2016 and the pages' "about me" sections state that the Zionsville Magazine and Carmel Magazines are the ORIGINAL monthly magazines that feature fascinating stories about remarkable residents, businesses and charities in Zionsville and Carmel, Indiana respectively (Filing No. 19-6).

101.    In addition, Defendants have been contacting advertisers to see if they had received Defendants' publications and threatening them to pay Collective Publishing instead of TownePost. One of the advertisers contacted by Ms. Lucas after the TRO had been issued, T&H Sweeper Co.,

sent a letter to Plaintiffs stating that they were discontinuing business with Carmel Newsletter/TownePost because they are "confused about who is doing what." The letter is dated October 26, 2016. When Ms. Britt contacted T&H Sweeper after receiving the letter, she was informed by Tom Hickey ("Mr. Hickey"), the owner, that Ms. Lucas had contacted him that week and told him that he was bound by his contract with Defendants for advertising in their magazines. Mr. Hickey told Ms. Lucas that he wanted to stay with TownePost and Ms. Lucas informed him that Mr. and Ms. Britt were franchisees of Collective Publishing and Collective Publishing had terminated the Britt's as franchisees (see Filing No.19-9 at ECF p. 2).

102.    Defendants' attempt to publish and distribute November and December issues of their version of the Carmel Magazine and Zionsville Magazine and to solicit advertisers to purchase ads in such magazines is intended to unfairly trade on the goodwill and reputation associated with the TownePost system and will result in Plaintiffs being irreparably harmed by the loss of control over, and harm to, its valuable name and trademarks in which it has invested substantial effort and money to develop goodwill. Additionally, allowing Defendants to publish and distribute their versions of the Carmel Magazine and Zionsville Magazine and to continue to use the names "Carmel Magazine" and "Zionsville Magazine" will cause further confusion among customers, advertisers, potential advertisers, and the general public.

## COUNT I

## TORTIOUS INTERFERENCE WITH CONTRACTS

103.    Plaintiffs incorporate paragraphs 1 through 102 of its Complaint as if set out in their entirety herein.

104.    Plaintiffs provide the Licensees, including A3 Media, with forms, contracts, and other documents containing the proprietary marks for use in selling advertisements and operation of the business.

105.    Licensees are not authorized to change any other aspect of the documents.

106.    On or about August 17, 2016, Ms. Lucas began circulating a document to advertisers that purported to cancel their contracts with the Carmel Magazine and Zionsville Magazine for the remaining months of October 2016, November 2016 and December 2016 and render such contracts null and void.  The contracts referred to in this document are the contracts between the advertisers and TownePost.  In the cancellation document, Ms. Lucas acknowledges and accepts the cancellation of the remaining months of the contract with TownePost.  However, Ms. Lucas had no authority to do so and is intentionally interfering with TownePost's contracts. See Exhibits NN and OO.

107.    Furthermore, A3 Media sent invoices to customers asking them to "Make all checks payable to A3 Media" or to Collective Publishing and sent a letter to advertisers recommending, among other things, that advertisers contact their banks immediately to instruct them not to honor credit card transactions from TownePost.  See Exhibits J, O, and EE.

108.    As a result of these communications, at least three customers have called TownePost with questions because they were confused as to which magazines they have agreed to advertise in and who they have agreed to pay and at least five advertisers have pulled their advertisements from the publications altogether.

109.    One customer, Chateau Kitchen, called to ask if TownePost was doing business under the name Collective Publishing since their credit card was charged by Collective Publishing for the amount of the invoice for the September issue.

110.    Defendants have intentionally interfered with the contractual relationship by changing the terms of the contract and instructing customers to make checks payable to A3 Media or Collective Publishing instead of TownePost.

111.    There is no justification for Defendants' actions.

112.    Plaintiffs have been, and continue to be, damaged as a result of Defendants' actions.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants, jointly and severally, and award Plaintiffs costs, attorneys' fees, damages and all other appropriate relief as the result of Defendants' actions.

## COUNT II
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

113.    Plaintiffs incorporate paragraphs 1 through 112 of its Complaint as if set out in their entirety herein.

114.    Plaintiffs provide the Licensees, including A3 Media, with administrative services, including invoicing customers and remitting payment to the Licensees as applicable.

115.    Once an order is approved by a client, it is invoiced by TownePost on or around the fifteenth (15th) of each month prior to the issue date.  For example, the October 2016 issues were invoiced on September 15, 2016.

116.    All invoices are issued by TownePost for all ads and services sold in all publications, including A3 Media.  Customers receive one invoice for the applicable time period, regardless of whether they advertised in more than one publication.

117.    All invoices are emailed electronically to the billing contact from Ms. Britt and she is the only one who has the authority and capability of invoicing customers through Maghub.

118.    Customers pay their invoices to "TownePost Network Inc." and may click through to a secure site to pay their invoices with a credit card from this email.

119.    On or about September 16, 2016, A3 Media sent invoices to customers asking them to "Make all checks payable to A3 Media" or to Collective Publishing and sent a letter to

advertisers recommending, among other things, that advertisers contact their banks immediately to instruct them not to honor credit card transactions from TownePost.  See Exhibits J, O, and EE.

120.    As a result of these communications, at least three customers have called TownePost with questions because they were confused as to which magazines they have agreed to advertise in and who they have agreed to pay and at least five advertisers have pulled their advertisements from the publications altogether.

121.    One customer, Chateau Kitchen, called to ask if TownePost was doing business under the name Collective Publishing since their credit card was charged by Collective Publishing for the September invoice.

122.    In addition, Mr. Lucas has emailed TownePost's designer, Ms. Folzenlogel, and demanded that she turn over any design files allegedly owned by A3 Media.  Mr. Lucas further warned Ms. Folzenlogel that if she possessed any design files allegedly owned by A3 Media or used them without authorization, she would be equally liable under the Indiana conversion statute that he attached to the email.  See Exhibit P.

123.    Ms. Lucas also began circulating a document to advertisers that purported to cancel their contracts with the Carmel Magazine and Zionsville Magazine for the remaining months of October 2016, November 2016 and December 2016 and render such contracts null and void.  The contracts referred to in this document are the contracts between the advertisers and TownePost.  In the cancellation document, Ms. Lucas acknowledges and accepts the cancellation of the remaining months of the contract with TownePost.  However, Ms. Lucas had no authority to do so and is intentionally interfering with TownePost's contracts.  See Exhibits NN and OO.

124.    Defendants were aware of the invoicing process and operated under this agreement for several years.

29

125.    Defendants were aware of the business relationships between TownePost and the customers and Ms. Folzenlogel.

126.    Defendants intentionally interfered with the business relationship by instructing customers to pay invoices to A3 Media or Collective Publishing instead of TownePost, by "cancelling" agreements between advertisers and TownePost, and by threatening Ms. Folzenlogel with legal action in an attempt to induce them to cease working with TownePost.  See Exhibits J, O, P and EE.

127.    There is no justification for Defendants' actions.

128.    Plaintiffs have been, and continue to be, damaged as a result of Defendants' actions.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants, jointly and severally, and award Plaintiffs costs, attorneys' fees, damages and all other appropriate relief as the result of Defendants' actions.

## COUNT III
## CONVERSION

129.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 128 hereof.

130.    All invoices are issued by TownePost for all ads and services sold in all publications, including A3 Media.  Customers receive one invoice for the applicable time period, regardless of whether they advertised in more than one publication.

131.    Customers pay their invoices to "TownePost Network Inc." and may click through to a secure site to pay their invoices with a credit card from this email.

132.    Despite being aware of the invoicing and billing process utilized by TownePost, Defendants have collected and have attempted to collect moneys rightfully owed to TownePost.

133.     Specifically, Collective Publishing charged Chateau Kitchens' credit card in the amount of $850.00, the same amount that was invoiced to Chateau Kitchen by TownePost for the September issue.  See Exhibit S.

134.     A3 Media also sent an Invoice to Vine & Table which stated: "Make all checks payable to A3 Media" and Ms. Lucas sent an email to "advertisers of Carmel and Zionsville Magazines" recommending that advertisers contact their banks immediately to instruct them not to honor credit card transactions from TownePost and asking advertisers to mail checks to Collective Publishing, the Publisher.  See Exhibits J and EE.

135.     Defendants' actions are not authorized by TownePost.

136.     Plaintiffs have been and continue to be deprived the use and enjoyment of its property and income.

137.     Plaintiffs have been and continue to be damaged as a result of the unauthorized use and control of its property and income by Defendants.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants, jointly and severally, and award Plaintiffs costs, attorneys' fees, damages and all other appropriate relief as the result of Defendants' actions in accordance with Ind. Code § 34-24-3-1.

## COUNT IV

## TRADEMARK INFRINGEMENT UNDER SECTION 32(A) OF THE LANHAM ACT, 15 U.S.C. § 1114(A)

138.     Plaintiffs incorporate paragraphs 1 through 137 of its Complaint as if set out in their entirety herein.

139.     TownePost is the owner of a certain valid and legally protected Registered Mark that is registered with the United States Patent and Trademark Office.

140.     Defendants have actual notice of TownePost's Registered Mark.

141. Defendants have and continues to use TownePost's Registered Mark in an unauthorized manner.

142. Specifically, Ms. Lucas sent an email to advertisers containing links to "their" Magazines. The links connect to the September issues of the Magazines which contain TownePost's Registered Mark. Directing advertisers and potential advertisers to TownePost's magazines as a sales tactic and claiming ownership of the magazines, which includes TownePost's Registered Mark, constitutes an unauthorized use of TownePost's Registered Mark and such use is likely to cause confusion, or to cause mistake, or to deceive the recipients of the communication into believing that Defendants' magazines are associated with, or approved by, Plaintiffs. See Exhibits HH, RR, and SS.

143. Upon information and belief, Defendants have used TownePost's Registered Mark in other unauthorized ways.

144. The unauthorized use of TownePost Network's Registered Mark constitutes trademark counterfeiting in violation of 15 U.S.C. § 1114(1)(a).

145. Defendants' infringement is willful in that at all material times Defendants had express notice of TownePost's Registered Mark.

146. Defendants intended to trade on the recognition of TownePost's Registered Mark.

147. As a direct and proximate result of Defendants' actions, TownePost has been damaged and will continue to be damaged. Accordingly, TownePost is entitled to recover monetary damages for Defendants' violations of the Lanham Act in accordance with 15 U.S.C. § 1117, in an amount to be proven at trial.

148. In addition, as a direct and proximate result of Defendants' actions, TownePost has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by

money damages alone; thus, TownePost is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing TownePost's Registered Marks in violation and contravention of the Federal Lanham Act; award Plaintiffs compensatory damages, costs, and attorney fees in accordance with 15 U.S.C. § 1117; and award any and all other relief this Court deems just, equitable and proper.

## COUNT V

## TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, AND UNFAIR COMPETITION UNDER SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

149.     Plaintiffs incorporate paragraphs 1 through 148 of its Complaint as if set out in their entirety herein.

150.     TownePost is the owner of certain valid and legally protected Registered Marks that are registered with the United States Patent and Trademark Office.  Additionally, Plaintiffs have common law trademark rights based on prior use of the names ""Carmel Magazine", "Zionsville Magazine", "Carmel Community Newsletter", "Zionsville Community Newsletter", "Carmel Community Magazine", and "Zionsville Community Magazine" (collectively "common law marks").

151.     Defendants have actual notice of TownePost's Registered Mark and common law marks.

152.     Defendants have and continue to use TownePost's Registered Mark and common law marks in an unauthorized manner.

153.     Specifically, Ms. Lucas sent an email to advertisers containing links to "their" Magazines.   The links connect to the September issues of the Magazines which contain

33

TownePost's Registered Mark.  Directing advertisers and potential advertisers to TownePost's magazines as a sales tactic and claiming ownership of the magazines, which includes TownePost's Registered Mark, constitutes an unauthorized use of TownePost's Registered Mark and such use is likely to cause confusion, or to cause mistake, or to deceive the recipients of the communication into believing that Defendants' magazines are associated with, or approved by, Plaintiffs. See Exhibits HH, RR, and SS.

154.    In addition, Ms. Lucas solicited quotes from printers as the VP of Sales for TownePost Media Network, Carmel Magazine and Zionsville Magazine.  One such request used the subject line "Quote #18681-1 for Towne Post Media Network.  See Exhibit I.

155.    Upon information and belief, Defendants have used TownePost's Registered Marks and common law marks in other unauthorized ways.

156.    Defendants' continued unauthorized use of TownePost's marks have caused actual confusion and is likely to cause further confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' services and commercial activities, and thus constitutes trademark infringement, false designation of origin, and unfair competition with respect to TownePost's Licensed Marks and common law marks in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

157.    Defendants' conduct is willful in that at all material times Defendants had express notice of TownePost's Registered Marks and common law marks and Defendants intended to trade on the recognition of TownePost's Registered Marks and common law marks.

158.    As a direct and proximate result of Defendants' actions, TownePost has been damaged and will continue to be damaged.  Accordingly, TownePost is entitled to recover

monetary damages for Defendants' violations of the Lanham Act in accordance with 15 U.S.C. § 1117, in an amount to be proven at trial.

159.     In addition, as a direct and proximate result of Defendants' actions, TownePost has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages alone; thus, TownePost is entitled to relief pursuant to 15 U.S.C. §§ 1116 and 1118.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing TownePost's marks in violation and contravention of the Lanham Act; award Plaintiffs compensatory damages, costs, and attorney fees in accordance with 15 U.S.C. § 1117; and award any and all other relief this Court deems just, equitable and proper.

## COUNT VI
## UNFAIR COMPETITION AND VIOLATIONS OF INDIANA TRADEMARK ACT

160.     Plaintiffs incorporate paragraphs 1 through 159 of its Complaint as if set out in their entirety herein.

161.     Plaintiffs have common law trademark rights based on prior use of the names "Carmel Magazine", "Zionsville Magazine", "Carmel Community Newsletter", "Zionsville Community Newsletter", "Carmel Community Magazine", and "Zionsville Community Magazine" (collectively "common law marks").

162.     Defendants have actual notice of Plaintiffs' prior use of the common law marks.

163.     Defendants have and continue to use Plaintiffs' common law marks in an unlawful manner.

164.     Defendants' continued use of Plaintiffs' common law marks has caused and is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' services and commercial activities, and thus constitutes trademark infringement, false designation of origin, and unfair competition with respect to Plaintiffs' common law marks.

165.     Specifically, in comparing Defendants' Carmel Magazine and Zionsville Magazine covers to TownePost's Carmel Magazine and Zionsville Magazine covers, the names, font, and color of the masthead are virtually identical.  The only difference is the removal of "A TownePost Network Publication" and the domains "atCarmel.com" and "atZionsville.com" from Defendants' magazine.  Additionally, many of the advertisements contained in Defendants' Carmel Magazine and Zionsville Magazine and TownePost's Carmel Magazine and Zionsville Magazine are identical.  See Exhibits KK and LL.

166.     Defendants' conduct is willful in that at all material times Defendants had express notice of Plaintiffs' prior use of its common law marks and Defendants intended to trade on the recognition of Plaintiffs' common law marks by registering the names on the state trademark database.

167.     Due to Defendants' express notice of Plaintiffs' prior use of its common law marks, A3 Media's application and subsequent registration of Plaintiffs' common law marks is fraudulent. Specifically, the application states, in pertinent part, that the signatory affirms under penalty of perjury that the applicant owns the mark and no other person or organization has the right to use the trademark/service mark in Indiana in either identical form or in a form so resembling it as might be calculated to deceive or be mistaken for it.  The affirmation of this in the application is a false statement.

36

168.   In addition, Defendants continue to use the common law marks without authorization and deceptively represent to advertisers and other third parties that they are the owners of said marks.

169.   Specifically, Ms. Lucas sent an email to advertisers containing links to "their" Magazines.  The links directly reference Mr. Britt and connect to the September issue of the Magazines which contain TownePost's marks and are owned by TownePost.  Directing advertisers and potential advertisers to TownePost's magazines as a sales tactic and claiming ownership of the magazines, which includes TownePost's Registered Mark, constitutes an unauthorized use of TownePost's Registered Mark and such use is likely to cause confusion, or to cause mistake, or to deceive the recipients of the communication into believing that Defendants' magazines are associated with, or approved by, Plaintiffs. See Exhibits HH, RR, and SS.

170.   As a direct and proximate result of Defendants' actions, Plaintiffs' have been damaged and will continue to be damaged.  Accordingly, Plaintiffs are entitled to recover monetary damages for Defendants' violations of the Indiana Trademark Act in accordance with Ind. Code §§ 24-2-1-12 and 24-2-1-13, in an amount to be proven at trial.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants' and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing Plaintiffs' common law marks; award Plaintiffs compensatory damages, costs, and attorney fees in accordance with Ind. Code §§ 24-2-1-12 and 24-2-1-13; and award any and all other relief this Court deems just, equitable and proper.

## COUNT VII
## UNFAIR COMPETITION & PASSING OFF

171.    Plaintiffs incorporate paragraphs 1 through 170 of its Complaint as if set out in their entirety herein.

172.    Plaintiffs have common law trademark rights based on prior use of the names "Carmel Magazine", "Zionsville Magazine", "Carmel Community Newsletter", "Zionsville Community Newsletter", "Carmel Community Magazine", and "Zionsville Community Magazine" (collectively "common law marks").

173.    Plaintiffs were the first to use the common law marks in commerce and distributed their publications under the common law marks to approximately 25,000 homeowners and businesses in the Carmel, Indiana area and approximately 10,000 homeowners and businesses in the Zionsville, Indiana area each month.  As such, the public associates the common law marks with Plaintiffs. Plaintiffs marks are identified as part of the TownePost Publication marks and thus have acquired secondary meaning.

174.    At all times Plaintiffs have exercised control over the quality of the publications by requiring Licensees to receive Plaintiffs' approval before modifying the magazine design in any manner and providing Licensees:

    a.   Print newsletter production and oversight management;

    b.   Ad design, both print and online, and associated processes oversight;

    c.   Weblog support, and updates;

    d.   Online advertising design and management;

    e.   New product development and implementation;

    f.   On-going training and consultation monthly to insure financial success; and

    g.   Print vendor negotiations and pricing.

175.    Defendants have actual notice of Plaintiffs' prior use of the common law marks.

176.    Defendants have and continue to use Plaintiffs' common law marks in an unlawful manner.

177.    Defendants' continued and intentional unauthorized use of Plaintiffs' common law marks has caused actual confusion and is likely to cause further confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' services and commercial activities, and thus constitutes trademark infringement, false designation of origin, and unfair competition with respect to Plaintiffs' common law marks.

178.    Specifically, in comparing Defendants' proposed cover for the Zionsville Magazine to TownePost's cover for its Zionsville Magazine, the names, font, and color of the masthead are virtually identical.  The only difference between the covers is the removal of "A TownePost Network Publication" the domain "atZionsville.com" from Defendants' magazine. Allowing two virtually identical magazines to be distributed to the same population and geographic area will cause further confusion among customers, advertisers, potential advertisers, and the general public and will cause irreparable harm to Plaintiffs.   See Exhibits KK and LL.

179.    Defendants' conduct is willful in that at all material times Defendants had express notice of Plaintiffs' prior use of its common law marks and Defendants intended to trade on the recognition of Plaintiffs' common law marks by registering the names on the state trademark database.

180.    Due to Defendants' express notice of Plaintiffs' prior use of its common law marks, A3 Media's application and subsequent registration of Plaintiffs' common law marks is fraudulent. Specifically, the application states, in pertinent part, that the signatory affirms under penalty of perjury that the applicant owns the mark and no other person or organization has the right to use the trademark/service mark in Indiana in either identical form or in a form so resembling it as

might be calculated to deceive or be mistaken for it.  The affirmation of this in the application is a false statement.

181.    In addition, Defendants continue to use the common law marks without authorization and deceptively represent to advertisers and other third parties that they are the owners of said marks.

182.    Specifically, Ms. Lucas sent an email to advertisers containing links to "their" Magazines.  The links directly reference Mr. Britt and connect to the September issue of the Magazines which contain TownePost's marks and are owned by TownePost.  See Exhibit FF.

183.    As a direct and proximate result of Defendants' actions, Plaintiffs' have been damaged and will continue to be damaged.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants' and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing Plaintiffs' common law marks; award Plaintiffs compensatory damages, costs, and attorney fees; and award any and all other relief this Court deems just, equitable and proper.

## COUNT VIII
## TRADE NAME INFRINGEMENT

184.    Plaintiffs incorporate paragraphs 1 through 183 of its Complaint as if set out in their entirety herein.

185.    Plaintiffs have common law trademark rights based on prior use of the names "Carmel Magazine", "Zionsville Magazine", "Carmel Community Newsletter", "Zionsville Community Newsletter", "Carmel Community Magazine", and "Zionsville Community Magazine" (collectively "common law marks").

186.    Plaintiffs were the first to use the common law marks in commerce and distributed their publications under the common law marks to approximately 25,000 homeowners and businesses in the Carmel, Indiana area and approximately 10,000 homeowners and businesses in the Zionsville, Indiana area each month.  As such, the public associates the common law marks with Plaintiffs.

187.    At all times Plaintiffs have exercised control over the quality of the publications by requiring Licensees to receive Plaintiffs' approval before modifying the magazine design in any manner and providing Licensees:

    a.  Print newsletter production and oversight management;

    b.  Ad design, both print and online, and associated processes oversight;

    c.  Weblog support, and updates;

    d.  Online advertising design and management;

    e.  New product development and implementation;

    f.  On-going training and consultation monthly to insure financial success; and

    g.  Print vendor negotiations and pricing.

188.    Defendants have actual notice of Plaintiffs' prior use of the common law marks.

189.    Defendants have and continue to use Plaintiffs' common law marks in an unlawful manner.

190.    Defendants' continued unauthorized use of Plaintiffs' common law marks has caused actual confusion and is likely to cause further confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' services and commercial activities, and thus constitutes trademark infringement, false designation of origin, and unfair competition with respect to Plaintiffs' common law marks.

191.   Specifically, in comparing Defendants' proposed cover for the Zionsville Magazine to TownePost's cover for its Zionsville Magazine, the names, font, and color of the masthead are virtually identical.  The only difference between the covers is the removal of "A TownePost Network Publication" the domain "atZionsville.com" from Defendants' magazine. Allowing two virtually identical magazines to be distributed to the same population and geographic area will cause further confusion among customers, advertisers, potential advertisers, and the general public and will cause irreparable harm to Plaintiffs.   See Exhibits KK and LL.

192.   At least three customers have called TownePost with questions because they were confused as to which magazines they have agreed to advertise in and who they have agreed to pay and at least five advertisers have pulled their advertisements from the publications altogether.

193.   Defendants' conduct is willful in that at all material times Defendants had express notice of Plaintiffs' prior use of its common law marks and Defendants intended to trade on the recognition of Plaintiffs' common law marks by registering the names on the state trademark database.

194.   Due to Defendants' express notice of Plaintiffs' prior use of its common law marks, A3 Media's application and subsequent registration of Plaintiffs' common law marks is fraudulent. Specifically, the application states, in pertinent part, that the signatory affirms under penalty of perjury that the applicant owns the mark and no other person or organization has the right to use the trademark/service mark in Indiana in either identical form or in a form so resembling it as might be calculated to deceive or be mistaken for it.  The affirmation of this in the application is a false statement.

195.    In addition, Defendants continue to use the common law marks without authorization and deceptively represent to advertisers and other third parties that they are the owners of said marks.

196.    Specifically, Ms. Lucas sent an email to advertisers containing links to "their" Magazines.  The links directly reference Mr. Britt and connect to the September issue of the Magazines which contain TownePost's marks and are owned by TownePost.  See Exhibit FF.

197.    As a direct and proximate result of Defendants' actions, Plaintiffs' have been damaged and will continue to be damaged.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants' and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing Plaintiffs' common law marks; award Plaintiffs compensatory damages, costs, and attorney fees; and award any and all other relief this Court deems just, equitable and proper.

## COUNT IX
## CIVIL CONSPIRACY

198.    Plaintiffs incorporate paragraphs 1 through 197 of its Complaint as if set out in their entirety herein.

199.    Plaintiffs have a good faith belief that Defendants are using Dann, Jody and Chilly Panda as a way to circumvent the TRO based on the email Dann and Chilly Panda sent to Joe Kempler regarding the November invoice for Defendants' versions of the Carmel Magazine and Zionsville Magazine on behalf of Mr. Lucas and Ms. Lucas.  Such actions demonstrate Defendants' indifference and disregard for the TRO and is evidence that Defendants, Dann, Jody and Chilly Panda are conspiring to harm Plaintiffs by unlawfully using Plaintiffs' common law

43

marks and unfairly trading on the goodwill and reputation associated with the TownePost system. See Exhibit UU.

200.    Defendants, Dann, Jody and Chilly Panda are engaging in concerted action to:

   a.    Circumvent the TRO;

   b.    Unlawfully use Plaintiffs' common law marks; and

   c.    Unfairly trading on the goodwill and reputation associated with the TownePost system.

201.    Plaintiffs also have a good faith belief that Defendants, Dann, Jody and Chilly Panda have conspired to unlawfully harm Plaintiffs in other material ways that will be discovered through the course of discovery.

WHEREFORE, Plaintiffs request that the Court: grant an injunction against Defendants' and all other persons or entities acting in concert or participation with them to enjoin Defendants from infringing Plaintiffs' common law marks; award Plaintiffs compensatory damages, costs, and attorney fees; and award any and all other relief this Court deems just, equitable and proper.

## COUNT X
## BREACH OF CONTRACT

202.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 201 hereof.

203.    Pursuant to the License Agreements, Defendants were not permitted to modify or change the magazine design in any manner unless it received Britt Interactive's prior written approval to do so.

204.    Not only did Defendants modify the magazine, they also modified agreements and invoices and subsequently sent them to customers.  In addition, Defendants sent a document to

advertisers that purported to cancel their contracts with the Carmel Magazine and Zionsville Magazine for the remaining months of October 2016, November 2016 and December 2016 and render such contracts null and void.  The contracts referred to in this document are the contracts between the advertisers and TownePost.  In the cancellation document, Ms. Lucas acknowledges and accepts the cancellation of the remaining months of the contract with TownePost.  However, Ms. Lucas had no authority to do so.  See Exhibits NN and OO.

205.    These modifications were not authorized by Plaintiffs or the License Agreements.

206.    In addition, under the License Agreements, Britt Interactive was responsible for performing the accounting functions such as invoicing, accounts payable, and accounts receivable.

207.    Defendants were not authorized to perform these accounting functions.  Despite this, Defendants sent several invoices to customers asking them to make checks payable to either A3 Media or Collective Publishing.

208.    Further, if Defendants failed to make a royalty payment when due, it was in default of the License Agreements.

209.    Defendants materially breached their contract with Britt Interactive when it unilaterally modified the magazine without Britt Interactive's prior approval, performed accounting functions such as invoicing and accounts receivable, and failed to make royalty payments when due.

210.    Plaintiffs have been and continue to be damaged by Defendants' breach of the License Agreements.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants and award Plaintiffs costs, attorneys' fees, damages to be proven at trial, and all other appropriate relief as the result of Defendants' actions.

## COUNT XI

## FRAUD

211.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 210 hereof.

212.    Defendants have made numerous false statements regarding the ownership of the Magazines, the marks, and their relationship to TownePost.

213.    Specifically, Ms. Lucas solicited quotes from printers as the VP of Sales for TownePost Media Network, Carmel Magazine and Zionsville Magazine.  One such request used the subject line "Quote #18681-1 for Towne Post Media Network.  See Exhibit CC.  Despite Ms. Lucas's assertion, she is not the VP of Sales for TownePost and the Magazines are not owned by A3 Media.  As such, Ms. Lucas's statements are false and misleading and demonstrate Defendants' intent to trade on the goodwill and reputation established by TownePost.

214.    In addition, in comparing Defendants' cover for its Zionsville Magazine and Carmel Magazine to TownePost's covers, the names, font, and color of the masthead are virtually identical.  The only difference is the removal of "A TownePost Network Publication" and the domains "atZionsville.com" and "atCarmel.com" from Defendants' magazine.  The similarity between the two covers demonstrates Defendants' intent to unlawfully trade on the goodwill and reputation of TownePost.  See Exhibits KK and LL.

215.    Furthermore, in the publisher's note in Defendants' Carmel Magazine it claims that TownePost was merely Defendants' vendor for ad design, magazine layout and certain accounting functions and that Collective Publishing has replaced TownePost in this regard.  See Exhibit QQ.

216.    Ms. Lucas also sent an email to a database of 4,038 people and advertisers stating that   her   email   address   had   changed   from   lena@atcarmel.com   to carmelmonthlymagazine@gmail.com and sent 151 emails to advertisers regarding advertising in

46

the November issues of the <u>Carmel Magazine</u> and <u>Zionsville Magazine</u>.  In the email, Ms. Lucas

states: *You can see the latest issues of our Magazines by following the link below.*  Despite Ms.

Lucas's contention, the Magazines are not owned by A3 Media and the September issues were not

published by A3 Media as evidenced by the use of Mr. Britt's name in the links themselves, the

TownePost marks on and in the Magazines, and the listing of TownePost as the Publisher in the

Magazines.  See Exhibits R, HH, RR and SS.

217.    On or about September 30, 2016, Ms. Lucas sent an email to "advertisers of Carmel

and Zionsville Magazines" stating that A3 Media had replaced TownePost as the vendor for

providing billing, collections and production services.  In addition, the email recommends that

advertisers contact their banks immediately to instruct them not to honor credit card transactions

from TownePost and asks advertisers to mail checks to Collective Publishing, the "Publisher."  See

Exhibit EE.

218.    Sometime during the week of October 24, 2016, Ms. Lucas contacted Mr. Hickey

of T&H Sweeping Company.  Mr. Hickey told Ms. Lucas that he wanted to stay with TownePost

and Ms. Lucas informed him that Mr. and Ms. Britt were franchisees of Collective Publishing and

Collective Publishing had terminated the Britt's as franchisees.  As a result of the communications

from Ms. Lucas, Mr. Hickey discontinued advertising with TownePost because he was "confused

about who is doing what."  See (Filing No.19-9 at ECF p. 2).

219.    Defendants also modified agreements, "cancelled" contracts between advertisers

and TownePost, and sent communications to advertisers and potential advertisers stating that

Collective Publishing was the Publisher of the Magazine and all checks should be made payable

to them.  See Exhibits O and NN.

220.    Upon information and belief, Defendants have made several other false, fraudulent and misleading statements.

221.    At all times, Defendants were aware their statements were false and were made with the intent to trade upon the goodwill and reputation of TownePost.

222.    Defendants intended that such statements be relied upon.

223.    Defendants' false and misleading statements were relied upon and TownePost has suffered damages as result of said reliance.

224.    As a result of Defendants' false and misleading statements, at least three customers have called TownePost with questions because they were confused as to whom they should pay their September invoice and at least five advertisers have pulled their advertisements from the publications altogether.

225.    Plaintiffs have been and continue to be damaged by Defendants' fraudulent statements.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants and award Plaintiffs costs, attorneys' fees, damages to be proven at trial, and all other appropriate relief as the result of Defendants' actions.


## COUNT XII
## NEGLIGENT MISREPRESENTATION

226.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 225 hereof.

227.    Defendants have made numerous misrepresentations regarding the ownership of the Magazines, the marks, and their relationship to TownePost.

228.    Specifically, Ms. Lucas solicited quotes from printers as the VP of Sales for TownePost Media Network, Carmel Magazine and Zionsville Magazine.  Despite Ms. Lucas's assertion, she is not the VP of Sales for TownePost and the Magazines are not owned by A3 Media.  See Exhibit CC.

229.    In addition, in comparing Defendants' covers for its Zionsville Magazine and Carmel Magazine to TownePost's cover, the names, font, and color of the masthead are virtually identical.  The only difference is the removal of "A TownePost Network Publication" and the domain "atZionsville.com" and "atCarmel.com" from Defendants' magazine.  The similarity between the two covers demonstrates Defendants' intent to unlawfully trade on the goodwill and reputation of TownePost.  See Exhibits KK and LL.

230.    Ms. Lucas also sent an email to a database of 4,038 people and advertisers stating that her email address had changed from lena@atcarmel.com to carmelmonthlymagazine@gmail.com and sent 151 emails to advertisers regarding advertising in the November issues of the Carmel Magazine and Zionsville Magazine.  In the email, Ms. Lucas states: *You can see the latest issues of our Magazines by following the link below.*  Despite Ms. Lucas's contention, the Magazines are not owned by A3 Media and the September issues were not published by A3 Media as evidenced by the use of Mr. Britt's name in the links themselves and the TownePost marks on and in the Magazines.  See Exhibits R and HH.

231.    On or about September 30, 2016, Ms. Lucas sent an email to "advertisers of Carmel and Zionsville Magazines" stating that A3 Media had replaced TownePost as the vendor for providing billing, collections and production services.  In addition, the email recommends that advertisers contact their banks immediately to instruct them not to honor credit card transactions

from TownePost and asks advertisers to mail checks to Collective Publishing, the Publisher. See Exhibit EE.

232.    Sometime during the week of October 24, 2016, Ms. Lucas contacted Mr. Hickey of T&H Sweeping Company. Mr. Hickey told Ms. Lucas that he wanted to stay with TownePost and Ms. Lucas informed him that Mr. and Ms. Britt were franchisees of Collective Publishing and Collective Publishing had terminated the Britt's as franchisees. As a result of the communications from Ms. Lucas, Mr. Hickey discontinued advertising with TownePost because he was "confused about who is doing what." See (Filing No.19-9 at ECF p. 2).

233.    Defendants also modified agreements, "cancelled" contracts between advertisers and TownePost, and sent communications to advertisers and potential advertisers stating that Collective Publishing was the Publisher of the Magazine and all checks should be made payable to them. See Exhibits O and NN.

234.    Upon information and belief, Defendants have made several other false and misleading statements.

235.    Defendants' statements are misrepresentations of past and existing facts.

236.    At all times, Defendants were aware their statements were false and/or had no reasonable belief to the grounds for its truth and were made with the intent to trade upon the goodwill and reputation of TownePost.

237.    Defendants intended that such statements be relied upon.

238.    Defendants' misrepresentations were relied upon and TownePost has suffered damages as result of said reliance.

239.    As a result of Defendants' misrepresentations, at least three customers have called TownePost with questions because they were confused as to whom they should pay their

September invoice and at least five advertisers have pulled their advertisements from the publications altogether.

240.    Plaintiffs have been and continue to be damaged by Defendants' misrepresentations.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants and award Plaintiffs costs, attorneys' fees, damages to be proven at trial, and all other appropriate relief as the result of Defendants' actions

Respectfully submitted,

/s/Josh F. Brown
Josh F. Brown, Attorney No. 26672-49
Stephanie L. Maris, Attorney No. 32060-64
Law Office of Josh F. Brown, LLC
12821 E. New Market Street, Suite 250
Carmel, IN 46032
T: 317.688.9111
F: 317.688.9100
E:  Josh@indyfranchiselaw.com


Jon Mattingly
Mattingly Burke Cohen & Biederman LLP
5255 Winthrop Avenue, Suite 100
Indianapolis, IN 46220
T: Main: 317.614.7320 | Direct: 317.614.7321
E: Jon.Mattingly@MBCBLaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 31, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be send to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

> P. Adam Davis
> Davis & Sarbinoff LLC
> 1 South Rangeline Road
> Suite 400
> Carmel, IN 46032
> efiling@d-slaw.com


/s/Josh F. Brown
Josh F. Brown, Attorney No. 26672-49

Law Office of Josh F. Brown, LLC
12821 E. New Market Street, Suite 250
Carmel, IN 46032
T: 317.688.9111
F: 317.688.9100