UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRITT INTERACTIVE LLC, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16-cv-2884-TWP-DML |
| | ) | |
| A3 MEDIA LLC, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| vs. | ) | |
| | ) | |
| TOM BRITT, *et al.,* | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## Report and Recommendation on Plaintiffs' Motion to Hold Lucas Parties in Contempt of Temporary Restraining Order

The Honorable Tanya Walton Pratt referred for a report and recommendation by this Magistrate Judge a "Motion to Hold Defendants in Contempt for Violations of the Temporary Restraining Order." As addressed below, the Magistrate Judge recommends that the motion be GRANTED IN PART AND DENIED IN PART.

### Introduction and Procedural Background

This case concerns the parties' respective ownership rights and liabilities arising from certain License Agreements relating to the publication of magazines about and for the communities of Carmel, Indiana and Zionsville, Indiana. It was commenced by the filing of a complaint on September 23, 2016, by plaintiffs Britt Interactive LLC and TownePost Network, Inc. (hereafter, the "Britt Companies") in the Hamilton Superior Court. They sought, and were granted after a hearing before

the Honorable Hamilton Superior Court Judge William J. Hughes, a temporary restraining order against defendants A3 Media, LLC, Collective Publishing, LLC, Yelena Lucas, and Neil Lucas (hereafter, collectively, the "Lucas Parties").[1]  Less than a week after the issuance of the TRO, the Lucas Parties removed the case to this court. Nearly immediately, the Britt Companies filed their motion for contempt of the TRO and a motion for, and request for hearing on, preliminary injunctive relief.

This Magistrate Judge determined, for efficiency and to allow the parties to prepare for the scheduled hearing on the motion for preliminary injunction, that a hearing on the motion for contempt of the TRO should await decision on the preliminary injunction motion.  The court anticipated that an evidentiary record on the preliminary injunction motion would streamline the presentation of evidence on the contempt motion, and the parties would be allowed to supplement that evidence, if necessary, and their legal arguments.  *See* Order Following Hearing and Scheduling Conference, Dkt. 59, ¶ 1.  After conducting expedited discovery for purposes of the preliminary injunction motion and immediately before the preliminary injunction hearing, the parties filed an Interim Agreement (Dkt. 100), which they asked the court to approve and which settled the motion for preliminary injunction.  On December 5, 2016, the court entered its order approving the parties' Interim Agreement.  Dkt. 101.

---

[1]    The Britt Companies also sought a TRO against defendant Janelle Morrison, but because there was no proof she had been served with process, the court did not enter its TRO against her.  *See* Plaintiffs' Exh. D (TRO hearing transcript at p. 65).

Because no evidentiary record on the preliminary injunction motion was created, the court set a hearing on the motion for contempt and required the parties to identify exhibits and witnesses for the hearing. *See* Order Setting Hearing, Dkt. 131. A hearing was held before the undersigned on March 23, 2017. The parties agreed that their evidence was limited to certain documents, and none offered witness testimony. The plaintiffs were present by counsel, Jonathan Mattingly and Josh Brown. The Lucas Parties were present by counsel, P. Adam Davis, and defendant Neil Lucas was present in person for himself and as a representative of A3 Media LLC and Collective Publishing LLC. Before the hearing, the court adjudicated, on a preliminary basis, certain objections to proffered evidence. Ultimately, the evidentiary record was established without objections, except with respect to a "time stamp" issue for certain emails, which is addressed below. The evidentiary rulings on the parties' exhibits were as follows:

1.     The Britt Companies withdrew Exhibits C, G-1 (labeled "Supplemental Exhibit G"), I, and J.

2.     The parties stipulated to the admission of the Britt Companies' remaining exhibits (A, B, D, E, F, G, H, K, L, M, N, O, P, Q, R, S, T, U, V, W, and X), which the court admitted into evidence.

3.     The Lucas Parties' exhibits (1, 2, 3, 4, and 5) were admitted into evidence without objection.

Near the conclusion of the hearing (and for the first time), the Lucas Parties suggested that the time stamps on certain emails (Exhibits N, O, P, Q, and R) sent

by defendant Yelena Lucas on October 19, 2016, did not accurately reflect the Eastern time zone from which they were actually sent. They asked the court for permission to present in writing the argument that these emails, all dated October 19, 2016, were sent from the Eastern Time zone at a time different from that reflected on the emails, or, that the time shown on these emails is expressed as a time zone that is six hours ahead of the Eastern time zone from which the emails were actually sent. The court granted the request to make the argument, and allowed the Britt Companies to respond.

The date stamps on the subject emails express the time as "CEST." For example, the time entry on the exhibit N email is "Wed Oct 19 20:10:36 CEST 2016." Exhibits O, P, Q, and R express the time in a similar fashion, *i.e.,* military time with the notation "CEST." These emails were produced belatedly in discovery by the Lucas Parties on November 30, 2016 (the documents were required to have been produced by November 23, 2016). The Lucas Parties assert that before producing the emails, they used a software program to convert them to .pdf format, and that that program apparently converted the time stamp to a military time and to a time zone called CEST. When the documents were reviewed before production, the Lucas Parties or their counsel assumed that CEST referred to either the Central time zone or the Eastern time zone, which was immaterial to the contempt issues because a change of one hour did not affect whether the emails were sent after the TRO became effective.[2] The Lucas Parties now assert that CEST is "Central

_____

[2]    The effective date and time of the TRO is addressed in more detail *infra.*

4

European Summer Time,"[3] which is a time zone six hours later than the Eastern time zone on October 19, 2016. If the court were to accept this explanation, then:

- The first email on page 1 of Exhibit N was actually sent at 2:10 p.m. Eastern, and not 8:10 p.m.

- The first email on page 1 of Exhibit O was actually sent at 2:50 p.m. Eastern, and not 8:50 p.m.

- The email on Exhibit P was actually sent at 3:19 p.m. Eastern, and not 9:19 p.m.

- The email on Exhibit Q was actually sent at 4:08 p.m. Eastern, and not 10:08 p.m.

- The email on Exhibit R was actually set at 5:27 p.m. Eastern, and not 11:27 p.m.

*See* Lucas Parties' Notice Regarding October 19, 2016 Emails (Dkt. 185).

The Britt Companies object to the court's consideration of evidence and argument that these emails were sent at a time different from the hour and minute reflected on the emails if characterized in the Eastern time zone. The Britt Companies are correct that this explanation from the Lucas Parties comes too late. The Lucas Parties knew about the time stamps on these documents no later than their production on November 30. All parties briefed the contempt motion with the understanding that the time stamps reflected the Eastern time zone from which

---

[3] With their post-hearing submission, the Lucas Parties included a document printed from "timeanddate.com" that explains that CEST is the acronym for Central European Summer Time. *See* Dkt. 185-6.

they were sent, and the Lucas Parties stipulated to the admissibility of the emails with the understanding that the time stamps reflected Eastern time. Moreover, there is no admissible evidence that a software program had actually caused the conversion of an actual time in the Eastern time zone to the corresponding time in the Central European Summer Time zone. In addition, even if the court is willing to characterize the emails as having been sent six hours before the times shown on them, two (Exhibits Q and R) of the five were still sent after the effective date and time of the TRO.

All these things said—and without the admission of any new post-hearing evidence on the issues—the court finds it more likely than not that the CEST time stamp on Exhibits N, O, P, Q, and R is six hours later than when the emails were actually sent.

One of the Defendants' admitted exhibits, Exhibit 3, is an email from Lena Lucas to Patricia Ogbonna and is an exact match to the first email within Plaintiffs' Exhibit N, except that each exhibit expresses the time differently. In Defendants' Exhibit 3, the time is "2:10 PM," while in Plaintiffs' Exhibit N, the time is "20:10:36 CEST." If the latter were converted from military time (which would make it 8:10 CEST) and six hours were subtracted from CEST to coincide with the Eastern time zone, the time would be 2:10 p.m.

The Lucas Parties' contention that the CEST times shown on Plaintiffs' Exhibits N, O, P, Q, and R should be converted to the Eastern time zone does not violate their stipulation to the admissibility of the Exhibits. Because the CEST

time zone is clearly shown on the subject emails and because there is convincing

evidence that the emails were converted from an Eastern time zone to a CEST zone

(*i.e.,* the comparison of the Lucas to Ogbonna emails at Plaintiffs' Exhibit N and at

Defendants' Exhibit 4), the court will subtract 6 hours from the CEST time zone

stamp on the subject emails.[4]

      The court now turns to its analysis of the parties' arguments about whether

the Lucas Parties should be found in contempt of the TRO.

## Analysis

## I.    The parties' dispute concerns competing community magazines.

      As noted at the outset, this lawsuit concerns the parties' respective

ownership rights and liabilities arising from certain License Agreements relating to

the publication of magazines about and for the communities of Carmel, Indiana and

Zionsville, Indiana. For a period of time, the parties' business relationship with

respect to a Carmel publication and a Zionsville publication was governed by

written License Agreements between Britt Interactive LLC and A3 Media, LLC (one

agreement pertaining to Carmel and a separate agreement pertaining to Zionsville).

Britt Interactive later assigned its rights and responsibilities under the contracts to

plaintiff TownePost Network, Inc.  Defendants Neil Lucas and Yelena Lucas,

husband and wife, are the principals of A3 Media, LLC, and Collective Publishing

LLC (the company formed by the Lucases to provide business services for the

---

[4]    It is unfortunate that this issue was first raised at the hearing, but the parties were given an appropriate opportunity after the hearing to address it.  The court does not believe the matter was raised in bad faith.

publication of Zionsville and Carmel community magazines after the termination, cancellation, or default under the License Agreements entered by A3 Media). Under these Agreements, generally, TownePost Network (or Britt Interactive before that) provided a turn-key community magazine publication platform and the Lucases provided the content and acted as editors, and were entitled to receive certain advertising dollars from individuals and entities which advertised their businesses in the magazines.[5]

After a rupture in the business relationship, the Britt Companies published their own October 2016 issues of "Carmel Magazine" and "Zionsville Magazine." *See* Plaintiffs' Exh. A (cover page and table of contents of plaintiffs' October issues of Carmel Magazine and of Zionsville Magazine). They learned that the Lucas Parties also intended to publish October 2016 issues of "Carmel Magazine" and "Zionsville Magazine," which led to the Britt Companies' seeking on October 11, 2016 (and eventually obtaining) the TRO. The Lucas Parties did publish October 2016 issues of "Carmel Magazine" and "Zionsville Magazine." *See* Plaintiffs' Exh. B (cover page and table of contents of the Lucas Parties' October issues of Carmel Magazine and Zionsville Magazine). The publication occurred apparently before October 13, 2016 (*see* Plaintiffs' Exh. O at p. 5), which was before the hearing on the TRO held October 17, 2016.

---

[5]    The court does not intend with this general description to make any finding on the merits in this case about the parties' rights and obligations under or arising from the License Agreements.

8

**II.    The TRO was issued on October 19, 2016, at 3:55 p.m.**

The Honorable Hamilton Superior Court Judge William J. Hughes issued a Temporary Restraining Order against A3 Media, LLC, Neil Lucas, Lena[6] Lucas, and Collective Publishing LLC, and in favor of plaintiffs Britt Interactive, LLC and TownePost Network, Inc.  The court made a finding that "Plaintiffs will suffer immediate and irreparable harm if Defendants A3 Media, LLC, Neil Lucas, Lena Lucas, and Collective Publishing, LLC distribute their October issues, or any subsequent issues, of the "Zionsville Magazine" and/or the "Carmel Magazine" and such distribution will cause further confusion among customers, advertisers, and the general public."   The court stated that the plaintiffs had posted a surety bond as the court had directed "as a condition for the issuance of the temporary restraining order," and decreed that:

Defendants are temporarily restrained and enjoined from

(a) distributing October issues, or any subsequent issues, of the "Zionsville Magazine" and/or the "Carmel Magazine";

(b) infringing TownePost's Licensed Marks in violation and contravention of the Lanham Act;

(c) infringing TownePost's common law marks in violation and contravention of the Indiana Trademark Act;

 (d) using marks that are the same as or confusingly similar to TownePost's Licensed Marks or common law marks in any manner including but not limited to in a print magazine, newsletter, or online medium; and

 (e) interfering with the contracts between TownePost and its advertisers.

---

[6]    Lena is a shortened form of defendant Yelena Lucas's first name.

Plaintiffs' Exh. E.  The TRO states it is issued on October 19, 2016, at 3:55 p.m.  *Id.*

After removal and on motion by the Britt Companies, the Honorable Judge Tanya Walton Pratt extended the duration of the TRO to November 14, 2016, at 3:00 p.m.  Dkt. 22.

### III.    The TRO was not in effect beginning on October 17, 2016.

In their briefing of the motion for contempt, the Britt Companies argued that the TRO became effective on October 17, 2016.  Before the hearing on the motion for contempt, the undersigned advised the parties that she would rule that the TRO did not become effective until the date and time of its issuance as shown by the TRO itself, so that they could frame their arguments in light of that (eventual) conclusion of law.  The court provided her reasoning, but stated that the ruling would not be formally made until the issuance of this report and recommendation so that any objection to the ruling could be made at the same time as any objections to other findings in this report and recommendation.  The court now finds that the TRO became effective on October 19, 2016, at 3:55 p.m., and no sooner.

The Britt Companies' argument that the TRO became effective on October 17, 2016, is based on the facts that Judge Hughes held the hearing on the motion for TRO on that date and stated during the hearing that he was granting injunctive relief, directed the plaintiffs' counsel to revise the order counsel originally had proposed, and decided on the amount of a bond required for the issuance of the TRO.  *See* Plaintiffs' Exh. D (TRO hearing transcript, at pp. 63-68, 70-73).  But Judge Hughes made clear during the hearing that the TRO "is effective and will be

entered upon the filing of a bond in the sum of $24,000 cash or surety acceptable to the Court." Plaintiffs' Exh D (TRO hearing transcript at p. 75). That statement tracks Indiana Trial Rule 65(C), which provides that a TRO cannot issue "except upon the giving of security by the applicant, in such sum as the court deems proper." That time (the provision of security) came, according to the TRO itself, on October 19, 2016, at 3:55 p.m. Plaintiffs' Exh. E.[7]

## IV. Contempt requires a showing of clear and convincing evidence that an unequivocal command in a court order was violated.

The Lucas Parties may be found in contempt only if the Britt Companies have proved by clear and convincing evidence that the Lucas Parties violated a court order. *Bailey v. Roob,* 567 F.3d 930, 934-35 (7th Cir. 2009); *Goluba v. School District of Ripon,* 45 F.3d 1035, 1037 (7th Cir. 1995). There need not be a finding that any violation was "willful," and a party may be found in civil contempt if it "has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Bailey,* 567 F.3d at 935 (quotations and citations omitted). The Seventh Circuit has used a four-part test for evaluating a contempt motion. As applied to this case, the Britt Companies have the burden to show by clear and convincing evidence:

1.  The TRO sets forth an unambiguous command.

---

[7]      This court's order extending the duration of the TRO stated that Judge Hughes granted the TRO motion on October 17, 2016 (*see* Dkt. 22 at pp. 2 and 4), citing the TRO itself. As noted above, the hearing was held on October 17, and Judge Hughes specifically ruled (consistent with Indiana law) that a TRO would not be effective until bond was posted.

2. The Lucas Parties violated that command.

3. Their violation was significant, meaning the conduct alleged to be a violation did not substantially comply with the TRO; and

4. The Lucas Parties failed to take steps to reasonably and diligently comply with the TRO.

*Id.* (citing *Prima Tek II, LLC v. Klerk's Plastic Industries, B.V.,* 525 F.3d 533, 542 (7th Cir. 2008)).

## V. Any actions taken by the Lucas Parties after 3:55 p.m. on October 19, 2016 can violate the TRO.

The Lucas Parties contend they were allowed some leeway after the court's issuance of the TRO at 3:55 p.m. to conform their behavior to the prohibitions in the TRO.[8]  Judge Hughes emailed the TRO to counsel at 4:01 p.m., and the Lucas Parties' counsel forwarded that email to his clients at 4:41 p.m.  Defendants' Exh. 1. The Lucas Parties do not state what this time leeway should be, except to suggest that anything they did before their counsel emailed the TRO to them at 4:41 p.m. is not a violation of the TRO.

---

[8]    The Lucas Parties also argue they could not have known that the TRO would be entered against Neil Lucas, Yelena Lucas, or Collective Publishing (and not just A3 Media) because Judge Hughes stated he would not enter the order against these three parties because they had not been served, citing Plaintiffs' Exh. D at page 65, lines 18-25.  The court rejects that argument because shortly after making the statement, Judge Hughes reversed himself when the Britt Companies' counsel provided the court with certain documents at the hearing.  Judge Hughes then ruled that based on the documents, notice had been sufficiently provided to Neil Lucas, Yelena Lucas, and Collective Publishing (as well as A3 Media), and the injunction would run against all of them.  *Id.* at p. 71, lines 6-17.  The only named defendant at the time of the TRO against whom the TRO was not entered is Janelle Morrison.  *Id.* at p. 71, lines 18-20.

The court rejects their argument. At the October 17, 2016 hearing, Judge Hughes made clear—by reference to a proposed order the Britt Companies had tendered (and which the Lucas Parties' counsel also had in hand at the hearing and obviously was reading when the court announced the contents of his injunction)— the language of his temporary injunction, and he told the Britt Companies' counsel to send him a revised document with the revised language. Plaintiffs' Exh. D, p. 70, line 22 to p. 73, line 10. Judge Hughes also made clear that the injunction would become effective "and will be entered upon the filing of a bond." *Id.*, p. 75, lines 22-25.

The evidence shows that the Lucas Parties were determined to take advantage of the time lag between the court's announcing of the wording of its injunction at the October 17 hearing and the point a bond would be filed. They deliberately engaged in conduct after the October 17 hearing and before the effective time/date of the TRO that violates the language of the TRO. The TRO prohibits the Lucas Parties from "using marks that are the same as or confusingly similar to TownePost's Licensed Marks or common law marks in any manner including but not limited to in a print magazine, newsletter, or online medium." The marks referenced in the TRO are "Zionsville Magazine" and "Carmel Magazine."

Before the TRO hearing, the Lucas Parties had made prominent announcements to readership and advertisers about their ownership of "Zionsville Magazine" and "Carmel Magazine" and that TownePost was no longer associated

13

with the magazines and had no rights to payment for advertising dollars. On September 30, 2016, Lena Lucas (identifying herself as the Owner and Director of Sales of Carmel Magazine and Zionsville Magazine) sent an email to "Advertisers of Carmel and Zionsville Magazines," reporting that (1) she and her husband Neil own "Zionsville Magazine" and "Carmel Magazine," (2) TownePost has simply been replaced as a vendor by Collective Publishing, (3) payment of advertising fees must be made to Collective Publishing and not to TownePost, which no longer has authority to accept payments, and (4) Collective Publishing has all rights to collect accounts receivable. Plaintiffs' Exh. N at p. 3.

In the Lucas Parties' October 2016 issues of "Zionsville Magazine" and "Carmel Magazine" (which were published before the effective date of the TRO and sometime before October 13[9]; the Britt Companies do not assert that their publication violated the TRO), they similarly announced, in a prominent "Publishers Note," that they are the owners of Carmel Magazine and Zionsville Magazine and have simply replaced TownePost Network as its vendor "for ad design, magazine layout and certain accounting functions" with a new company called Collective Publishing. *See* Plaintiffs' Exh. B. The same "Publishers Note" statement had also been released by the Lucas Parties on October 10, 2016, on linkedin.com under the heading, "Latest News from the Publishers of Carmel

---

[9]    An October 13, 2016 email from Lena Lucas to an advertiser states that the Lucas Parties' October issues of Carmel Magazine and Zionsville Magazine had already been published. *See* Plaintiffs' Exh. O at p. 5.

Magazine and Zionsville Magazine" with a picture of the planned cover of the Lucas Parties' October 2016 issue of "Carmel Magazine."

After having made these prominent announcements to the world, including the magazines' customers (readers and advertisers) about their ownership of Carmel Magazine and Zionsville Magazine, the Lucas Parties engaged in conduct between the time of the TRO hearing and the effective time of the TRO that reinforced their assertions of continued ownership of "Carmel Magazine" and "Zionsville Magazine," even though they knew Judge Hughes had decided to prohibit their use of those marks.  They worked on anticipated later issues of Carmel Magazine and Zionsville Magazine, and on October 18, 2016 (the day after the hearing), sent invoices to advertisers for ads in upcoming November issues of "Carmel Magazine" and "Zionsville Magazine."  Plaintiffs' Exhibit K is a form email dated October 18, 2016, titled "November Invoice from Carmel Magazine and/or Zionsville Magazine," depicting the covers of those November issues, and attaching an invoice for ads in either of the two magazines.  The invoice attached to the form email at Exhibit K is to one advertiser (Remax) for a full-page ad in the Lucas Parties' November issue of Carmel Magazine, and directs payment to Collective Publishing.  Other exhibits strongly evince that the form email was sent to other advertisers on October 18, 2016.  *See* Plaintiffs' Exh. R at p. 4 (invoice date of October 18, 2016, to advertiser White Electrical for November issues of Carmel and Zionsville magazines); Plaintiffs' Exh. T at p. 4 (invoice date of October 18, 2016, to

15

advertiser Raymond James for November issues of Carmel and Zionsville magazines).

Lena Lucas continued to conduct her "business as usual" as "Carmel Magazine" and "Zionsville Magazine" on the very date the TRO became effective, although some communications occurred before the 3:55 p.m. effective date of the TRO.  For example, she had numerous email communications on October 19 with an advertiser between 1:18 p.m. and 2:10 p.m., seeking to collect a nearly $2,000 invoice that the Lucases had billed to the advertiser.  Plaintiffs' Exh. N.  She continued to engage in email negotiations on October 19 between 11:15 a.m. and 2:50 p.m. with a vendor for the inclusion of a holiday catalog in anticipated November and December issues of Carmel Magazine and Zionsville Magazine.  Plaintiffs' Exh. O.   At 2:23 p.m. on October 19, she sent an email to an advertiser and content contributor seeking his ad and an article for Carmel and Zionsville Magazines.  Plaintiffs' Exh. W.  At 3:19 p.m. on October 19, she sent an email to an advertiser making a "limited time" offer price for the back cover of the November and December issues of Carmel Magazine and Zionsville Magazine, and promised that "[w]e are going to print next Monday."  Plaintiffs' Exh. P.

Other email or internet communications by which Ms. Lucas, or the Lucas Parties, continued to use the marks "Carmel Magazine" and "Zionsville Magazine" occurred after 3:55 p.m., and they reflect (as addressed below) the same kind of "business as usual" contained in the communications sent before the TRO was made effective. Under these circumstances, there is no rational basis for allowing a party

16

some additional leeway after the effective time of the TRO to conform conduct to the court's proscriptions. A baseball analogy, as suggested at the hearing by the Britt Companies, is apt. In baseball, when a ball is hit, a runner can advance to the next base. If the ball is caught in the air, however, the runner must "tag up" by getting back to the base she came from before attempting to advance to the next base. If the runner does not get back to her original base before the ball is caught by the offense at that base, she is out. Here, Judge Hughes's announced injunction at the October 17 hearing was a ball that had been caught in the air, then thrown and on its way to the base; it would be caught at the base the moment bond was posted. The Lucas Parties knew they risked being "out" if proscribed conduct happened after bond was posted and the order became effective. To the extent they found themselves too far off the bag with insufficient time to get back to base before Judge Hughes issued the TRO, at 3:55 p.m., they must be stuck with the consequences of having violated the court's order.

The court finds the above analogy—though accurate—more benign than the Lucas Parties' conduct warrants. They had notice as of the afternoon of October 17 that a TRO would be entered, the reasons Judge Hughes had determined a TRO was appropriate, and what the TRO would prohibit. Rather than making plans for and adopting procedures to ensure compliance with the proscriptions of the TRO Judge Hughes had announced, they in fact did the opposite: they pushed the limits by engaging in conduct the court had already determined should be enjoined, and

that conduct was clearly designed to advance positions the court had rejected during the TRO hearing.

So while that conduct between the hearing and the effective date/time of the TRO cannot be the basis of a contempt finding, it does provide a context. The Lucas Parties tried to push their conduct right to the edge, and having gone over the edge, have asked the court to excuse it. Under these circumstances, they are not entitled to any leeway.

## VI.    The Lucas Parties engaged in conduct in violation of commands of the TRO after its effective date and time, and the violations were significant.

There is substantial evidence that after the effective time of the TRO, the Lucas Parties continued to use the marks "Carmel Magazine" and "Zionsville Magazine," in clear violation of the TRO's injunction against their using those marks *in any manner*. The violations are:

1.    At 4:06 p.m. and separately at 4:08 p.m. on October 19, 2016, Lena Lucas (representing herself as the owner of "Carmel Magazine" and "Zionsville Magazine") sent emails to advertisers making a "limited time" offer price for the back cover of the November and December issues of "Carmel Magazine" and "Zionsville Magazine." Plaintiffs' Exh. H at pp. 3-4 and Plaintiffs' Exh. S.

2.    At 5:27 p.m. on October 19, 2016, Lena Lucas (representing herself as the owner of "Carmel Magazine" and "Zionsville Magazine") sent an email to an advertiser enclosing invoices dated October 19, 2016, on behalf of "Carmel

18

Magazine" and "Zionsville Magazine" for advertisements in the two magazines. Plaintiffs' Exh. R.

3.     On October 20, 2016, at 10:19 a.m., Lena Lucas emailed an advertiser, and represented herself to be the owner of "Carmel Magazine" and "Zionsville Magazine."  Plaintiffs' Exh. Q.

4.     On October 21, 2016, Lena Lucas emailed an invoice that she created on October 21, 2016, which used the marks "Carmel Magazine" and "Zionsville Magazine."  Plaintiffs' Exh. T at pp. 2 (email) and 4 (invoice).

5.      On October 24, 2016, at 9:55 a.m., Lena Lucas responded to an email from an advertiser (Sharyl J. Border) who forwarded an email from the Britt Companies containing the TRO's language.  Her email continues to use the marks "Carmel Magazine" and "Zionsville Magazine" as part of her signature and represents she is the owner of these publications.  Plaintiffs' Exh. U.

6.     Printouts from Twitter show that the Lucas Parties continued to use Carmel Magazine and Zionsville Magazine (promoting their October issues) as of October 24, 2016.  Plaintiffs' Ex. F.

These persistent uses by the Lucas Parties of the marks "Carmel Magazine" and "Zionsville Magazine" to promote themselves and their business are significant violations of the TRO.  The people with whom Lena Lucas was communicating after the TRO, still using the marks "Carmel Magazine" and "Zionsville Magazine," could not have discerned anything different from the message(s) they received loud and clear in the period before the TRO was entered that "Carmel Magazine" and

"Zionsville Magazine" belonged to the Lucas Parties. After the TRO, there was no change to Lena Lucas's attribution of herself as the owner of Carmel Magazine and Zionsville Magazine, who was working on behalf of Carmel Magazine and Zionsville Magazine to sell advertising, collect money, and arrange for content.[10] The Lucas Parties therefore used the marks in clear violation of the TRO. Their violations are shown by clear and convincing evidence. The court therefore reports and recommends that the District Court hold the Lucas Parties, jointly and severally, in contempt of sub-paragraph (d) of the TRO.[11]

## VII. The Britt Companies are entitled to a remedy.

The court has broad discretion to prescribe a remedy for the Lucas Parties' violations and contempt of the TRO and should take into account the nature of the harm their actions caused. *Eppley v. Iacovelli,* 2010 WL 724557 at *4 (S.D. Ind. Feb. 25, 2010) (quoting *Federal Trade Comm'n v. Trudeau,* 579 F.3d 754, 771 (7th

---

[10]    At least by November 15, 2016, Ms. Lucas began using the marks "Carmel Monthly" and "Zionsville Monthly," instead of Carmel Magazine and Zionsville Magazine. Plaintiffs' Exh. X.

[11]    The Britt Companies suggest that some of the communications by Lena Lucas also violate subparagraph (e) of the TRO, which enjoined the Lucas Parties from "interfering with the contracts between TownePost and its advertisers." The court finds this language ambiguous considered in light of the evidence admitted at the hearing. There is nothing in the TRO to assist the court in identifying "the contracts" that exist (or existed) between TownePost and its advertisers. A finding of contempt of this portion of the TRO is therefore not appropriate. The court also cannot find that subparagraphs (a), (b), and (c) were violated. There was no evidence that the Lucas Parties distributed October or subsequent issues while the TRO was in effect (subparagraph (a)). Subparagraphs (b) and (c) enjoin "infringement" of federal (the Lanham Act) or state law (the Indiana Trademark Act), language which does not provide sufficiently clear information about what is prohibited.

20

Cir. 2009)) (particular remedy for party's contempt should be "'based on the nature of the harm and the probable effect of alternative sanctions'").  Civil contempt remedies (as opposed to criminal contempt) are remedies that coerce compliance, as opposed to ones that punish past non-compliance without the opportunity for the party to purge its contempt.  *Trudeau,* 579 F.3d at 777.  Nevertheless, a civil contempt remedy may include, where appropriate, compensatory remedies to the harmed party where it is based on the party's actual losses caused by noncompliance with the court's order.  *Id.*  The Britt Companies have asked the court to award their attorneys' fees in bringing and litigating the motion for contempt and to allow them—because of discovery deficiencies at the time of the adjudication of the contempt motion—at some later point to attempt to show they suffered actual damages.

Before the hearing and based on apparent deficiencies in the Lucas Parties' search for and production of documents (for example, advertising invoices and receipts had not been produced by that time), the court ruled that the Britt Companies could bring a second and subsequent motion for contempt if they later discovered other evidence of alleged contemptuous conduct during the time the TRO was in effect.  At the time a second motion for contempt is filed (if it is), the Britt Companies will be permitted to present evidence of any actual damages, including with respect to the conduct that was at issue at the hearing.  The court agreed with the Britt Companies that their inability to present evidence of actual damages was stymied by incomplete discovery responses, and thus they may, in effect, "re-open"

21

the issue of any compensatory damages at a later time.  The finality of this ruling on the motion for contempt is not affected by the potential that there may be a "re-opening" of proof of compensatory damages either for subsequently discovered violations or for those found by this order.

The court does have the power to award attorneys' fees. *See Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 785-86 (7th Cir. 1981) (award of fees in civil contempt proceeding is proper and is independent of any award of compensatory damages).  An award is not mandatory, but within the court's discretion.  *Id.* at 785.  The court finds that an award of reasonable[12] fees is appropriate, particularly in light of the difficulty of proof of actual losses caused by the Lucas Parties' contemptuous conduct.  If the Britt Companies later seek to establish actual damages for conduct this order has found violative of the TRO, the court will take into account that its decision to award to the Britt Companies their reasonable attorneys' fees in litigating the contempt motion contemplated a relative inability to prove actual losses and the degree to which an award of attorneys' fees has provided some compensatory relief.

---

[12]    The court is not suggesting that *all* fees attributable to the contempt motion ultimately would be awarded.  An important and "the most critical" factor in deciding a reasonable fee is degree of success obtained.  *Linda T. ex rel. William A. v. Rice Lake Area School Dist.,* 417 F.3d 704, 708 (7th Cir. 2005) ("The most critical factor in determining the reasonableness of a fee award is the degree of success obtained.")  The Britt Companies were not successful in demonstrating that all of the conduct they complained about violated the TRO.

## Conclusion

For the reasons explained in this entry, the Magistrate Judge recommends that the District Judge GRANT IN PART AND DENY IN PART the Britt Companies' motion for contempt of the TRO (Dkt. 17), find the Lucas Parties in contempt of paragraph (d) of the TRO, and award the Britt Companies, and against the Lucas Parties, their reasonable attorneys' fees in bringing and litigating the motion for contempt.  If the District Judge accepts this recommendation, the court should order the Britt Companies to file a petition for attorneys' fees, supported by appropriate documentation, within 14 days of the issuance of an order adopting the Magistrate Judge's recommendation. The Lucas Parties' opposition would be due within 14 days thereafter, and any reply brief would be due 7 days thereafter.

**Any objections to this report and recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  The parties should not anticipate *any* extension of this deadline or any other related briefing deadlines.**

IT IS SO RECOMMENDED.

Dated:  July 28, 2017

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:
All ECF-registered counsel of record by email through the court's ECF system